**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

SPEECH FIRST, INC.,

*Plaintiff,*

v.

RENU KHATOR, in her individual capacity and official capacity as Chancellor of the University of Houston System and President of the University of Houston; PAULA MYRICK SHORT, in her individual capacity and official capacity as Senior Vice President for Academic Affairs and Provost; DANIEL M. MAXWELL, in his individual capacity and official capacity as Vice President of Student Affairs and Enrollment; DONELL YOUNG, in his individual capacity and official capacity as Associate Vice President of Student Affairs and Dean of Students; KAMRAN RIAZ, in his individual capacity and official capacity as Associate Dean of Students; DEVON FAN, in his individual capacity and official capacity as Equal Opportunity Coordinator and Trainer; and TILMAN J. FERTITTA, RICKY RAVEN, BETH MADISON, DURGA D. AGRAWAL, DOUG H. BROOKS, ALONZO CANTU, STEVE I. CHAZEN, JOHN A. MCCALL JR., and JACK B. MOORE, all in their individual capacities and official capacities as members of the University of Houston System Board of Regents,

*Defendants.*

Case No. _____

**VERIFIED COMPLAINT**

Plaintiff, Speech First, Inc., brings this action under the First and Fourteenth Amendments to the United States Constitution, *see* 42 U.S.C. §1983, against Defendants and alleges as follows:

**INTRODUCTION**

1.      "The vigilant protection of constitutional freedoms is nowhere more vital than in the community of American [universities]." *Healy v. James*, 408 U.S. 169, 180 (1972). In theory, "[t]he college campus is peculiarly suited to serve as a marketplace of ideas and a forum for the robust

exchange of different viewpoints." *Solid Rock Found. v. Ohio State Univ.*, 478 F. Supp. 96, 102 (S.D. Ohio 1979).

2.      Yet the University of Houston System and the University of Houston (together, the "University") and their officials have enacted a speech code that punishes students for engaging in protected speech and deters them from expressing views that are outside the mainstream.

3.      The University's "harassment" policy disciplines students who "subject[] an individual on the basis of their membership in a protected class to unlawful severe, pervasive, or persistent treatment" that

1. is "[h]umiliating, abusive, or threatening" and "denigrates or shows hostility or aversion towards an individual or group"; or

2. creates "[a]n intimidating, hostile, or abusive learning, living, or working environment, or an environment that alters the conditions of learning, living, or working"; or

3. causes "[a]n unreasonable interference with an individual's academic or work performance."

According to the University, "harassment" that violates this policy includes "epithets or slurs," "negative stereotyping," "denigrating jokes," and "display or circulation (including through email or virtual platforms) of written or graphic material in the learning, living, and working environment."

4.      This overbroad restriction on protected speech violates the First and Fourteenth Amendments.

## JURISDICTION AND VENUE

5.      This action arises under the First and Fourteenth Amendments to the United States Constitution and is brought via 42 U.S.C. §§1983 and 1988.

6.      The Court has subject-matter jurisdiction under 28 U.S.C. §§1331 and 1343.

7.      Venue is proper under 28 U.S.C. §1391 because all Defendants reside here and a substantial part of the events or omissions giving rise to the claims occurred here.

## PARTIES

8.      Plaintiff, Speech First, Inc., is a nationwide membership organization of students, alumni, and other concerned citizens. Speech First is dedicated to preserving civil rights secured by law, including the freedom of speech. Speech First seeks to protect the rights of students and others at colleges and universities through litigation and other lawful means. Speech First has members who attend the University, including Students A, B, and C.

9.      The University of Houston System is a public institution that oversees the University of Houston, the University of Houston-Clear Lake, the University of Houston-Downtown, and the University of Houston-Victoria. Policies issued by the University of Houston System are binding on each of the member universities.

10.      The University of Houston is a public university organized and existing under the laws of Texas.

11.      Defendant Renu Khator is Chancellor of the University of Houston System and President of the University of Houston. Khator is responsible for the enactment and enforcement of all University policies, including the harassment policy challenged here. Khator is sued in her individual and official capacities.

12.      Defendant Paula Myrick Short is Senior Vice President for Academic Affairs and Provost of the University. Myrick Short is responsible for the implementation and enforcement of University policies, including the harassment policy challenged here. Myrick Short is sued in her individual and official capacities.

13.      Defendant Daniel M. Maxwell is Vice President of Student Affairs and Enrollment at the University. Maxwell is responsible for overseeing the enforcement of University policies, including the harassment policy challenged here. Maxwell is sued in his individual and official capacities.

14.     Defendant Donell Young is Associate Vice President of Student Affairs and Dean of Students at the University. Young is responsible for all aspects of the Dean of Students Office, including enforcement of the harassment policy challenged here. Young is sued in his individual and official capacities.

15.     Defendant Kamran Riaz is Associate Vice President of Student Affairs and Dean of Students at the University. Riaz manages the day-to-day functions of the Dean of Students Office and is the principal coordinator of how the University enforces its student-conduct policies, including the harassment policy challenged here. Riaz is sued in his individual and official capacities.

16.     Defendant Devon Fan is Equal Opportunity Coordinator and Trainer at the University. Fan is responsible for enforcement of the harassment policy challenged here. Fan is sued in his individual and official capacities.

17.     Defendants Tilman J. Fertitta, Ricky Raven, Beth Madison, Durga D. Agrawal, Doug H. Brooks, Alonzo Cantu, Steve I. Chazen, John A. McCall Jr., and Jack B. Moore are members of the University of Houston System Board of Regents. The Board of Regents is the governing body of the University of Houston System and is responsible for establishing policies that apply to all member universities, including the harassment policy challenged here. The Board Defendants are all sued in their individual and official capacities.

## BACKGROUND

### I.    College Students and Their First Amendment Rights

18.     "The First Amendment reflects 'a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open.'" *Snyder v. Phelps*, 562 U.S. 443, 452 (2011) (quoting *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964)). "The right of citizens to inquire, to hear, to speak, and to use information to reach consensus is a precondition to enlightened self-government and a necessary means to protect it." *Citizens United v. FEC*, 558 U.S. 310, 339 (2010).

19.     The First Amendment's importance is at its apex at our nation's colleges and universities. "The vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools [of higher education]. The college classroom with its surrounding environs is peculiarly the 'marketplace of ideas.'" *Healy*, 408 U.S. at 180 (quoting *Shelton v. Tucker*, 364 U.S. 479, 487 (1960)). The core principles of the First Amendment "acquire a special significance in the university setting, where the free and unfettered interplay of competing views is essential to the institution's educational mission." *Doe v. Univ. of Mich.*, 721 F. Supp. 852, 863 (E.D. Mich. 1989) (citing *Keyishian v. Bd. of Regents*, 385 U.S. 589, 603 (1967)). "Teachers and students must always remain free to inquire, to study and to evaluate, to gain new maturity and understanding; otherwise our civilization will stagnate and die." *Sweezy v. N.H. ex rel. Wyman*, 354 U.S. 234, 250 (1957).

20.     The First Amendment's protections, moreover, are "not confined to the supervised and ordained discussion which takes place in the classroom" but extend throughout a university's campus. *Solid Rock Found.*, 478 F. Supp. at 102.

21.     Put simply, "First Amendment protections [do not] apply with less force on college campuses than in the community at large." *Healy*, 408 U.S. at 180. "The mere dissemination of ideas—no matter how offensive to good taste—on a state university campus may not be shut off in the name alone of 'conventions of decency.'" *Papish v. Bd. of Curators of Univ. of Mo.*, 410 U.S. 667, 670 (1973). Indeed, "the point of all speech protection is … to shield just those choices of content that in someone's eyes are misguided, or even hurtful." *Hurley v. Irish-American Gay, Lesbian, and Bisexual Group of Boston, Inc.*, 515 U.S. 557, 574 (1995).

22.     These principles apply with more force "[i]n our current national condition," not less. *Speech First, Inc. v. Fenves*, 979 F.3d 319, 339 (5th Cir. 2020).

## II.    Universities' Use of Overbroad "Harassment" Policies to Chill Speech

23.    Instead of promoting the "robust exchange of ideas," *Keyishian*, 385 U.S. at 603, universities are now more interested in protecting students from ideas that make them uncomfortable.

24.    Under the guise of "prohibit[ing] discriminatory harassment, unconstitutionally over-broad harassment policies" have "proliferated" at universities across the country. *Spotlight on Speech Codes 2021* at 13, FIRE, bit.ly/2PxkFzr (*2021 Spotlight*). All too often, "harassment" bans "fail to limit themselves to the narrow definition of harassment that is outside the realm of constitutional protection. Instead, they expand the term to prohibit broad categories of speech that do not even approach actionable harassment, despite similar policies having been struck down by federal courts years earlier." *Id.* at 19 & n.50 (collecting cases); *see also Fenves*, 979 F.3d at 338-39 & n.17 (collecting a "consistent line of cases that have uniformly found campus speech codes unconstitutionally overbroad or vague"). In other instances, university policies purport to "define harassment narrowly, then proceed to provide a list of examples of prohibited conduct that do not necessarily meet that standard when standing alone." *2021 Spotlight* 19.

25.    Contrary to popular belief, "'there is no harassment exception to the First Amendment's Free Speech Clause.'" *DeJohn v. Temple Univ.*, 537 F.3d 301, 316 (3d Cir. 2008) (quoting *Saxe v. State Coll. Area Sch. Dist.*, 240 F.3d 200, 204, 210 (3d Cir. 2001)). When bans on "'harassment'" cover speech, they impose "'content-based'" and often "'viewpoint-discriminatory'" restrictions on that speech. *Saxe*, 240 F.3d at 206 (quoting *DeAngelis v. El Paso Mun. Police Officers Ass'n*, 51 F.3d 591, 596-97 (5th Cir. 1995)).

26.    Universities with overbroad harassment policies often point to Title IX as a defense. *See 2021 Spotlight* 25. True, in *Davis v. Monroe County Board of Education*, the Supreme Court held that schools can violate Title IX's ban on sex-based discrimination if they are deliberately indifferent to sexual harassment by students. 526 U.S. 629, 633 (1999). But *Davis*, recognizing that public schools

are constrained by the First Amendment, adopted a narrow, speech-protective definition of sexual harassment: Actionable harassment under Title IX must be "behavior [that] is so severe, pervasive, and objectively offensive that it denies its victims the equal access to education." *Id.* at 652.

27. Despite this clear guidance from the Supreme Court, many universities define "harassment" more broadly than *Davis. See 2021 Spotlight* 25.

28. The Department of Education formally addressed this issue in 2020 through a regulation issued via notice-and-comment rulemaking. The 2020 rule "adopts" the Supreme Court's definition of sexual harassment from *Davis* "verbatim." *Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*, 85 Fed. Reg. 30,026, 30,036 (May 19, 2020). The *Davis* standard "ensures that speech … is not peremptorily chilled or restricted" because it applies only when harassment rises to the level of "serious *conduct* unprotected by the First Amendment." *Id.* at 30,151-52 (emphasis added); *see also id.* at 30,162-63. The 2020 rule thus defines "[s]exual harassment" to mean, in relevant part, "[u]nwelcome conduct determined by a reasonable person to be so severe, pervasive, and objectively offensive that it effectively denies a person equal access to the recipient's education program or activity." 34 C.F.R. §106.30(a).

29. Unfortunately, the Department's 2020 rule did not settle things. Most universities responded to it by imposing two separate harassment policies: one "Title IX harassment policy" that adopts the *Davis* standard, and another "non-Title IX harassment policy" that is much broader. *See 2021 Spotlight* 26.

30. Unsurprisingly, the rise of overbroad "harassment" policies at universities has contributed to a parallel rise in the percentage of college students who believe they are not free to express controversial opinions on campus. According to a September 2020 survey of more than 20,000 American college students, an astonishing 42 percent of students believe their university would punish them for making an offensive or controversial statement. *2020 College Free Speech Rankings* 19, FIRE (Sept.

2020), bit.ly/3w4miVG. A separate survey found that, among non-freshman college students, nearly half reported that "sharing ideas and asking questions without fear of retaliation, even when those ideas are offensive to some people," had become "more difficult" in the Fall 2020 semester than previously. *Campus Expression Survey Report 2020*, at 3, Heterodox Academy (Mar. 2021), bit.ly/31oG-Biy.

## III.   The University's Harassment Policy

31.     On December 27, 2021, the University issued Policy No. 01.D.07, titled "Anti-Discrimination" ("the Harassment Policy").

32.     The Policy prohibits students from engaging in "harassment." The Policy defines "harassment" as "[s]ubjecting an individual on the basis of their membership in a Protected Class to unlawful severe, pervasive, or persistent treatment that is:

- Humiliating, abusive, or threatening conduct or behavior that denigrates or shows hostility or aversion toward an individual or group;

- An intimidating, hostile, or abusive learning, living, or working environment, or an environment that alters the conditions of learning, living, or working; or

- An unreasonable interference with an individual's academic or work performance."

33.     The Policy defines "Protected Class" as a class of persons who are protected under law "on the basis of race, color, sex (including pregnancy), genetic information, religion, age (over 40), national origin, disability, veteran status, sexual orientation, gender identity or status, gender expression, or any other legally protected status."

34.     The Policy's "[e]xamples of harassment" make clear that the Policy covers protected speech. Examples of harassment "include but are not limited to: epithets or slurs, negative stereotyping, threatening, intimidating, or hostile acts, denigrating jokes and display or circulation (including through email or virtual platforms) of written or graphic material in the learning, living, or working environment."

35.     Under the Policy, even "[m]inor verbal and nonverbal slights, snubs, annoyances, insults, or isolated incidents including, but not limited to microaggressions," can constitute harassment if "such incidents keep happening over time and are targeting a Protected Class." *Id.* at 6. The Policy warns that "academic freedom and freedom of expression will not excuse behavior that constitutes a violation of the law or this Policy."

36.     The University claims broad "jurisdiction" to punish harassment. Students can commit harassment "on the University's Premises, at University-Affiliated Activities, and ... off University Premises [if the speech occurs] between two University-Affiliated individuals." Both students and "bystanders" can file reports of alleged harassment. These complaints can be submitted anonymously.

37.     Moreover, a University employee who "fails" to report suspected violations of the harassment policy "may be found to have violated [the] Policy, even if the underlying event does not constitute ... Harassment."

38.     The Policy sets forth disciplinary procedures and sanctions for students who are accused or found guilty of harassment. If the student is found to have violated the Policy, he or she will receive sanctions from the Dean of Student's office, with punishments ranging from disciplinary probation to suspension or expulsion. Further, the University reserves the right to take "appropriate action(s) to resolve" complaints of harassment in "addition to sanctions that may be imposed pursuant to" the Policy.

39.     The Student Code of Conduct confirms that violating the Policy is "prohibited conduct." The Student Code of Conduct also prohibits "complicity," meaning that students cannot "through act or omission, assist another student, individual, or group in committing or attempting to commit a violation" of the Code or any University policy, including the Harassment Policy. Any student who has "knowledge of another committing or attempting to commit" harassment must "remove themselves from the situation," and a "failure to do so" may violate the Code of Conduct.

40.     The University has acknowledged that the Policy prohibits a broad swath of protected speech. In April 2021, the University's Deputy General Counsel, Jeffrey Palmer, spoke to a group of students about the Policy and "hate speech." Despite acknowledging that hate speech is protected by the Constitution, Palmer stated:

> So, you might say to yourself, well, does that mean I can go out and say anything I want against any race, gender or religion? And the answer is no with regards to the University, right? Because we have policies, we have an anti-discrimination policy and anti-harassment policy so, presumably if you're saying something about a race, a religion, a gender, you're probably violating that policy. You're probably also violating the code of conduct. So that's where, even though it's protected under free speech, it actually ... isn't permitted by the University.

41.     Palmer's speech is available on the University's intranet system and can be accessed by any student, faculty member, or University employee. Speech First's members, like many students at the University, have watched this video.

## IV.     The Effect of the Harassment Policy on Speech First's Members

42.     Speech First's members who attend the University are suffering concrete injuries as a direct result of the University's unconstitutional harassment policy. These students want to engage in speech that is arguably covered by the University's policy, but they credibly fear that the expression of their deeply held views will be considered "intimidating," "denigrating," "negative stereotyp[es]," and the like. Rather than risk being reported, investigated, or sanctioned, they do not speak as freely as they otherwise would.

43.     One Speech First member, "Student A," is a freshman at the University.

44.     Student A is politically conservative and holds views that are unpopular, controversial, and in the minority on campus.

45.     Student A believes that affirmative action in college admissions is racist and fundamentally un-American, and that admitting certain students based on race, instead of merit, benefits neither those students nor the universities who accept them.

46. Student A firmly opposes legalized abortion because he believes that life begins at conception. He believes there are no circumstances that justify allowing women to kill an innocent child.

47. Student A believes that human beings are created either male or female, and that someone cannot "transition" from one sex to the other based on whether they "feel" that they are a man or a woman. Student A tries to be respectful to everyone he encounters, but he doesn't want to be forced to call someone a "he" or a "she" (or to use some other form of "preferred pronouns") just because that person has decided that "their truth" involves being transgender or non-binary.

48. Student A believes that it is deeply unfair to allow biological males who identify as females to compete in women's sports. He thinks those men are simply stealing athletic opportunities away from actual women who have earned them.

49. Student A believes that marriage is between a man and a woman, and that children are best served by being raised by a father and a mother. He thinks that redefining marriage to include any arrangement between two people is a slippery slope that will eventually lead to society being forced to accept marriages among multiple people or something even worse. His beliefs about marriage also stem from his Christian faith.

50. Student A is strongly against illegal immigration and believes that we need to enforce our immigration laws against anyone who is here illegally, no matter when they came here. Being a "Dreamer" who arrived here as a minor is not an excuse for continuing to break federal law by remaining in the country illegally.

51. Student A enrolled in the University because he wanted to learn in a challenging environment where students and faculty are free to engage in lively, fearless debate and deliberation.

52. Student A wants to engage in open and robust intellectual debate with his fellow students about these topics in the classroom, in other areas of campus, online, and in the City of Houston.

53.     When another a classmate or another member of the university community voices contrary views about affirmative action, abortion, gender identity, the nuclear family, or immigration, Student A wants to point out the flaws in their arguments and convince them to change their minds.

54.     Student A wants to speak directly to his classmates about these topics, and he wants to talk frequently and repeatedly on these issues. Given his views, he knows that many of these conversations will be heated and passionate. But he wants to have these conversations because he feels strongly about these issues.

55.     But the University's harassment policy makes Student A reluctant to openly express his opinions.

56.     Student A does not fully express himself or talk about certain issues because he fears that sharing his beliefs may be considered "harassment." He fears that other students will find his views "humiliating," "abusive," "threatening," "denigrating," "averse," or "intimidating" and claim that his views "interfere[] with" their performance or "alter" their environment, especially if he shares those views passionately and repeatedly. Student A believes that many of the topics he wants to address could easily be considered "harassment" under the University's policy.

57.     Student A's fears are grounded in his own personal experiences on campus. He has also watched a presentation on the University website given by a university administrator who informed members of student government that students can violate the harassment policy if they continually use "improper pronouns" when referring to another student, or if they "say[] something about a religion, a race, [or] a gender" that a listener may consider "hate speech." Knowing that University administrators consider expressions of his views to be "harassment" only enhances his fear of speaking openly about them.

58.     Student A's reluctance to speak is magnified by the fact that he can also be punished for "assisting" in another student's "harassment" simply by failing to "remove" himself from a situation.

59.     Another Speech First member, "Student B," is a sophomore at the University.

60.     Student B is politically conservative and holds views that are unpopular, controversial, and in the minority on campus.

61.     Student B strongly opposes illegal immigration. He believes that no one has the "right" to come to this country illegally and take jobs from American citizens. He thinks that illegal immigrants should not be eligible for government benefits and in-state tuition breaks funded by citizens who actually pay taxes. Student B also believes that we need to deport those who are living in the country illegally because we cannot have a safe and functioning society with open borders.

62.     Student B believes that the Second Amendment exists to guard against government tyranny, and that gun control laws are unconstitutional and only prevent law-abiding citizens from defending themselves.

63.     Student B believes that pay disparities between men and women are a straightforward consequence of the free market compensating individuals for what their work is worth. He thinks that laws mandating identical pay for men and women are absurd, unfair, and distort labor markets to solve a "problem" that doesn't exist.

64.     Although Student B has no ill will against the LGBT community, there are a lot of things that he simply doesn't understand—like how someone's "pronouns" can be "they/them" or "ze/zir." He doesn't want to be required to use someone's "preferred pronouns" and play along with the fiction that people can "decide" whether they are a male, a female, or neither.

65.     Student B enrolled in the University because he wanted to learn in a challenging environment where students and faculty are free to engage in lively, fearless debate and deliberation.

66.     Student B wants to engage in open and robust intellectual debate with his fellow students about these topics in the classroom, in other areas of campus, online, and in the City of Houston.

67.     When another a classmate or another member of the university community voices contrary views about the Second Amendment, immigration, the gender pay gap, or using transgender people's "preferred pronouns," Student B wants to point out the flaws in their arguments and convince them to change their minds.

68.     Student B wants to speak directly to his classmates about these topics, and he wants to talk frequently and repeatedly on these issues. Given his views, he knows that many of these conversations will be heated and passionate. But he wants to have these conversations because he feels strongly about these issues.

69.     But the University's harassment policy makes Student B reluctant to openly express his opinions.

70.     Student B does not fully express himself or talk about certain issues because he fears that sharing his beliefs may be considered "harassment." He fears that other students will find his views "humiliating," "abusive," "threatening," "denigrating," "averse," or "intimidating" and claim that his views "interfere[] with" their performance or "alter" their environment, especially if he shares those views passionately and repeatedly. Student B believes that many of the topics that he wants to address could easily be considered "harassment" under the University's policy.

71.     Student B's fears are grounded in his own personal experiences on campus. He has also watched a presentation on the University website given by a university administrator who informed members of student government that students can violate the harassment policy if they continually use "improper pronouns" when referring to another student, or if they "say[] something about a religion, a race, [or] a gender" that a listener may consider "hate speech." Knowing that University

administrators consider expressions of his views to be "harassment" only enhances his fear of speaking openly about them.

72.    Student B's reluctance to speak is magnified by the fact that he can also be punished for "assisting" in another student's "harassment" simply by failing to "remove" himself from a situation.

73.    Another Speech First member, "Student C," is a freshman at the University.

74.    Student C is politically conservative and holds political beliefs that are unpopular, controversial, and in the minority on campus.

75.    Student C believes that allowing biologically male athletes who identify as female to compete in women's sports is fundamentally unjust, because men and women have innate physiological differences that cannot be erased simply because someone chooses to "identify" as a member of the opposite sex. She believes that school administrators who ignore those differences are prioritizing identity politics and political correctness over the interests of women.

76.    As a woman, Student C does not want to be forced to "affirm" that a man is really a "woman" just because he decides to identify as one.

77.    Student C believes that the policies pushed by activist groups like the Black Lives Matter organization are corrosive to society and harmful to race relations. For example, she believes that creating "black spaces" or "spaces for people of color" on college campuses is just segregation by another name. She thinks the idea that any person is "privileged" based solely on his or her race is the definition of racism.

78.    Student C believes that abortion is morally wrong, and that people who choose to have abortions are not killing a "fetus" or a "clump of cells"—they're killing another human being. She believes that abortion should be illegal, regardless of whether a pregnancy is "planned" or "wanted."

79.     Student C strongly supports the State of Israel, and believes that Palestinian move-
ments like the Boycott, Divest, Sanction campaigns on many college campuses are anti-Semitic.

80.     Student C enrolled in the University because she wanted to learn in a challenging en-
vironment where students and faculty are free to engage in lively, fearless debate and deliberation.

81.     Student C wants to engage in open and robust intellectual debate with her fellow stu-
dents about these topics in the classroom, in other areas of campus, online, and in the City of Houston.

82.     When another a classmate or another member of the university community voices
contrary views about whether "transgender women" are really women, whether abortion is immoral,
or whether the State of Israel has a right to defend itself against Palestinians, Student C wants to point
out the flaws in their arguments and convince them to change their minds.

83.     Student C wants to speak directly to her classmates about these topics, and she wants
to talk frequently and repeatedly on these issues. Given her views, she knows that many of these
conversations will be heated and passionate. But she wants to have these conversations because she
feels strongly about these issues.

84.     But the University's harassment policy makes Student C reluctant to openly express
her opinions.

85.     Student C does not fully express herself or talk about certain issues because she fears
that sharing her beliefs may be considered "harassment." She fears that other students will find her
views "humiliating," "abusive," "threatening," "denigrating," "averse," or "intimidating" and claim
that her views "interfere[] with" their performance or "alter" their environment, especially if she shares
those views passionately and repeatedly. Student C believes that many of the topics that she wants to
address could easily be considered "harassment" under the University's policy.

86.     Student C's fears are grounded in her own personal experiences on campus. She has
also watched a presentation on the University website given by a university administrator who

informed members of student government that students can violate the harassment policy if they continually use "improper pronouns" when referring to another student, or if they "say[] something about a religion, a race, [or] a gender" that a listener may consider "hate speech." Knowing that University administrators consider expressions of her views to be "harassment" only enhances her fear of speaking openly about them.

87.     Student C's reluctance to speak is magnified by the fact that she can also be punished for "assisting" in another student's "harassment" simply by failing to "remove" herself from a situation.

88.     Similarly worded harassment policies have been applied to protected speech, or have been found to arguably ban protected speech, before.

89.     In *Fenves*, for example, Speech First challenged the University of Texas's harassment policy. That policy prohibited "hostile or offensive speech" that is "sufficiently severe, pervasive, or persistent to create an objectively hostile environment"; that "interferes with or diminishes the victim's ability to participate in or benefit from" the University's activities; and that "personally describes or is personally directed to one or more specific individuals." 79 F.3d at 334 n.12. The Fifth Circuit held that this policy arguably covered Speech First's members, who "wish[ed] to engage in robust debate on timely and controversial political topics from a contrarian point of view." *Id.* at 330.

90.     In *Dambrot v. Central Michigan University*, 55 F.3d 1177 (6th Cir. 1995), the plaintiffs challenged Central Michigan University's discriminatory-harassment policy. That policy prohibited "physical, verbal, or nonverbal behavior that subject[ed] an individual to an intimidating, hostile, or offensive educational, employment, or living environment" by "demeaning or slurring individuals" based on protected characteristics or "using symbols, [epithets] or slogans that infer[red] negative connotations about the individual's racial or ethnic affiliation." *Id.* at 1182. The Sixth Circuit held that this policy was unconstitutionally overbroad because, "on its face, the [policy] swe[pt] within its ambit

both constitutionally protected activity … and unprotected conduct, making it subject to an over-breadth challenge." *Id.* at 1183.

91.     In *Doe v. University of Michigan.*, 721 F. Supp. 852 (E.D. Mich. 1989), the plaintiffs challenged a University of Michigan policy prohibiting students from "'stigmatizing or victimizing' individuals or groups on the basis of race, ethnicity, religion, sex, sexual orientation, creed, national origin, ancestry, age, marital status, handicap or Vietnam-era veteran status." *Id.* at 853. The court held that the policy was unconstitutionally overbroad. *Id.* at 860.

92.     In its most recent Title IX rulemaking, the Education Department studied the issue and found that harassment policies like the University's have been applied to protected speech. These policies have not only "infringed on constitutionally protected speech," but also led "'many potential speakers to conclude that it is better to stay silent.'" 85 Fed. Reg. at 30,164-65 & nn.738-39.

## COUNT
### Violation of the First and Fourteenth Amendments

93.     Plaintiff repeats and realleges each of the prior allegations in this complaint.

94.     The First Amendment prohibits public universities from adopting regulations of students that are "so broad as to chill the exercise of free speech and expression." *Dambrot*, 55 F.3d at 1182. "Because First Amendment freedoms need breathing space to survive, a state may regulate in the area only with narrow specificity." *Gooding v. Wilson*, 405 U.S. 518, 522 (1972). A public university must carefully craft its regulations "to punish only unprotected speech and not be susceptible of application to protected expression." *Id.*

95.     A regulation is unconstitutionally overbroad if "a substantial number of its applications are unconstitutional." *United States v. Stevens*, 559 U.S. 460, 473 (2010). The Court must find such regulations facially unconstitutional because "the threat of enforcement of an overbroad [regulation] may deter or 'chill' constitutionally protected speech," as "[m]any persons, rather than undertake the considerable burden (and sometimes risk) of vindicating their rights through case-by-case litigation, will

choose simply to abstain from protected speech, harming not only themselves but society as a whole, which is deprived of an uninhibited marketplace of ideas." *Virginia v. Hicks*, 539 U.S. 113, 119 (2003).

96.     "There is no categorical 'harassment exception' to the First Amendment's free speech clause." *Saxe*, 240 F.3d at 204. Rather, "[t]he right to provoke, offend and shock lies at the core of the First Amendment. This is particularly so on college campuses. Intellectual advancement has tradition-ally progressed through discord and dissent, as a diversity of views ensures that ideas survive because they are correct, not because they are popular." *Rodriguez v. Maricopa Cty. Cmty. Coll. Dist.*, 605 F.3d 703, 708 (9th Cir. 2010). "[I]f it is the speaker's opinion that gives offense, that consequence is a reason for according it constitutional protection." *Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46, 55 (1988).

97.     The University's harassment policy is facially unconstitutional under the Free Speech Clause.

98.     While a university can prohibit harassment that amounts to "discrimination" against a protected class that is "so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to the educational opportunities or benefits provided by the school," *Davis*, 526 U.S. at 650, the University's harassment rule goes far beyond that. Its expansive terms and its refusal to adopt the speech-protective standard from *Davis* means it reaches large swaths of protected speech. It then imposes content-based, viewpoint-based restrictions on that speech.

99.     The Supreme Court has consistently recognized the "substantial and expansive threats to free expression posed by content-based restrictions." *United States v. Alvarez*, 567 U.S. 709, 717 (2012). "Content-based regulations" are "presumptively invalid." *R.A.V. v. City of St. Paul*, 505 U.S. 377, 382 (1992). Accordingly, "any restriction based on the content of the speech must satisfy strict scrutiny, that is, the restriction must be narrowly tailored to serve a compelling government interest." *Pleasant Grove City v. Summum*, 555 U.S. 460, 469 (2009).

100. "The First Amendment's hostility to content-based regulation extends" to "restrictions on particular viewpoints." *Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2230 (2015). Policies cannot "suppress disfavored speech." *Id.* at 2229. Viewpoint discrimination is flatly prohibited. *See Iancu v. Brunetti*, 139 S. Ct. 2294, 2302 (2019).

101. By restricting offensive speech about personal characteristics such as race, ethnicity, or gender, the harassment policy is a content-based and viewpoint-based restriction on protected speech. The University has no compelling interest in suppressing the unfettered exchange of viewpoints.

102. Even if the University could identify a compelling interest, its viewpoint-discriminatory ban is not narrowly tailored to furthering that interest. A policy that adopted the *Davis* standard verbatim is a narrower alternative that solves any legitimate interest the University might have. And the University's policy covers categories, including "genetic information" and "veteran's status," that go beyond what federal antidiscrimination laws require. *See Fenves*, 979 F.3d at 337 n.16 (describing the constitutionality of such a policy as "self-evidently dubious").

103. Defendants adopted this unconstitutional policy under color of state law.

**WHEREFORE**, Speech First respectfully requests that this Court enter judgment in favor of Plaintiff and against Defendants and provide the following relief:

A. A declaratory judgment that the University's harassment policy violates the First and Fourteenth Amendments;

B. A permanent injunction barring Defendants from enforcing the University's harassment policy;

C. A preliminary injunction granting the relief specified above during the pendency of this action;

D.      An order holding Defendants jointly and severally liable for nominal damages in the sum of $1;

E.      Plaintiff's reasonable costs and expenses of this action, including attorneys' fees, per 42 U.S.C. §1988 and all other applicable laws; and

F.      All other relief that Plaintiff is entitled to.


Dated: February 23, 2022                    Respectfully submitted,

                                            /s/ James F. Hasson
                                            J. Michael Connolly (*pro hac vice* forthcoming)
                                            Cameron T. Norris (*pro hac vice* forthcoming)
                                            James F. Hasson (TX Bar No. 24109982)
                                            CONSOVOY MCCARTHY PLLC
                                            1600 Wilson Blvd., Suite 700
                                            Arlington, VA 22209
                                            (703) 243-9423
                                            mike@consovoymccarthy.com
                                            cam@consovoymccarthy.com
                                            james@consovoymccarthy.com

## VERIFICATION

I, Cherise Trump, declare as follows:

1.  I am the President of Speech First, Inc., the plaintiff in this case.

2.  I have reviewed this complaint.

3.  For the allegations within my personal knowledge, I believe them all to be true.

4.  For the allegations not within my personal knowledge, I believe them all to be true based on my review of the cited policies and documents and based on my conversations with members of Speech First, including Students A, B, and C.

5.  I declare under penalty of perjury that the foregoing is true and correct.

Executed on February 23, 2022

_____
Cherise Trump, President of Speech First, Inc.