**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| SPEECH FIRST, INC., | |
| *Plaintiff,* | |
| v. | Case No. 4:22-cv-582 |
| RENU KHATOR, *et al.*, | |
| *Defendants.* | |

**REPLY IN SUPPORT OF PLAINTIFF'S
MOTION FOR A PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

Table of Authorities ................................................................................................ ii

Introduction ............................................................................................................ 1

Argument ................................................................................................................ 1

    I.   Speech First is likely to succeed on the merits ...................................... 2

       A.  Speech First likely has standing. .................................................. 2

       B.  The harassment policy is likely unconstitutional. ..................... 10

    II.  Speech First satisfies the remaining preliminary injunction criteria. ................. 17

Conclusion ............................................................................................................. 18

Certificate of Service ............................................................................................. 20

# TABLE OF AUTHORITIES

## CASES

*ACLU v. Fla. Bar*,
   999 F.2d 1486 (11th Cir. 1993) ...................................................................8

*Ams. for Prosperity Found. v. Bonta*,
   141 S. Ct. 2373 (2021) ...........................................................................10

*Bair v. Shippensburg Univ.*,
   280 F. Supp. 2d 357 (M.D. Pa. 2003) ........................................................13

*Boos v. Barry*,
   485 U.S. 312 (1988) ...............................................................................12

*Constantine v. Rectors & Visitors of George Mason Univ.*,
   411 F.3d 474 (4th Cir. 2005) .....................................................................6

*Dambrot v. Cent. Mich. Univ.*,
   55 F.3d 1177 (6th Cir. 1995) .....................................................................9

*Davis ex rel. LaShonda D. v. Monroe County Board of Education*,
   526 U.S. 629 (1999) ............................................................ 13, 14, 15, 16

*DeAngelis v. El Paso Mun. Police Officers Ass'n*,
   51 F.3d 591 (5th Cir. 1995) .....................................................................11

*DeJohn v. Temple Univ.*,
   537 F.3d 301 (3d Cir. 2008) .............................................................. 11, 13

*Elrod v. Burns*,
   427 U.S. 347 (1976) ...............................................................................17

*Gooding v. Wilson*,
   405 U.S. 518 (1972) ...............................................................................10

*Healy v. James*,
   408 U.S. 169 (1972) ........................................................................1, 11, 12

*Mahanoy Area Sch. Dist. v. B. L. ex rel. Levy*,
  141 S. Ct. 2038 (2021) ................................................................13

*Majors v. Abell*,
  317 F.3d 719 (7th Cir. 2003) .........................................................5

*McCauley v. Univ. of V.I.*,
  618 F.3d 232 (3d Cir. 2010) .........................................................13

*McCullen v. Coakley*,
  573 U.S. 464 (2014) ....................................................................12

*McDonald v. Longley*,
  4 F.4th 229 (5th Cir. 2021) ..........................................................18

*Members of City Council of Los Angeles v. Taxpayers for Vincent*,
  466 U.S. 789 (1984) ....................................................................10

*Providence Title Co. v. Truly Title, Inc.*, 547
  F. Supp. 3d 585 (E.D. Tex. 2021) ..................................................2

*R.A.V. v. City of St. Paul*,
  505 U.S. 377 (1992) ....................................................................17

*Saxe v. State Coll. Area Sch. Dist.*,
  240 F.3d 200 (3d Cir. 2001) .................................................... 8, 11

*Solid Rock Found. v. Ohio State Univ.*,
  478 F. Supp. 96 (S.D. Ohio 1979) ................................................13

*Speech First v. Cartwright*,
  2021 WL 3399829 (M.D. Fla. July 29, 2021) ................................16

*Speech First v. Fenves*,
  979 F.3d 319 (5th Cir. 2020).................................................passim

*Speech First v. Sands,*
  2021 WL 4315459 (W.D. Va. Sept. 22, 2021)..................................9

*Speech First, Inc. v. Schlissel*,
  939 F.3d 756 (6th Cir. 2019)..........................................................5

iii

*Texans for Free Enter. v. Texas Ethics Comm'n,*
    732 F.3d 535 (5th Cir. 2013) ............................................................... 17, 18

*Tinker v. Des Moines Independent Community School District,*
    393 U.S. 503 (1969) ............................................................................. 12

*United States v. Stevens,*
    559 U.S. 460 (2010) ............................................................................... 9

*UWM Post, Inc. v. Bd. of Regents of Univ. of Wisconsin Sys.,*
    774 F. Supp. 1163 (E.D. Wis. 1991) ................................................. 13, 15

*Wollschlaeger v. Gov'r,*
    848 F.3d 1293 (11th Cir. 2017) .......................................................... 11

## REGULATIONS

*Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal
    Financial Assistance,* 85 Fed. Reg. 30,026 (May 19, 2020) .................................. 14, 15, 16

## OTHER AUTHORITIES

*Conduct Assessment and Response Team (CART),* Univ. of Houston, uh.edu/cart/ (last
    visited Apr. 15, 2022) ......................................................................... 5

*Make a Report,* Equal Opportunity Servs., Univ. of Houston, uh.edu/equal-
    opportunity/make-a-report/ (last visited Apr. 15, 2022) ............................... 5

## INTRODUCTION

The Fifth Circuit has already considered every argument in the University's response. In *Speech First v. Fenves*, the University of Texas also put First Amendment disclaimers in its policies, swore that its policies were never applied to protected speech, and claimed that Supreme Court precedent didn't prohibit its harassment policy. 979 F.3d 319 (5th Cir. 2020). The Fifth Circuit saw through these all-too-familiar justifications for chilling student expression. It found that Speech First had standing to challenge the constitutionality of a nearly identical harassment policy, and it warned that courts have "uniformly" found these "campus speech codes unconstitutiona[l]." *Id.* at 338-39 & n.17 (listing cases). Nor did it entertain the notion that universities could use *Tinker*—a case about *children* in *junior high and high school*—to regulate the speech of adults on campus with a freer hand. That the University thinks it can, *see* Opp. (Doc. 18) 1, is frightening. Because the law "leave[s] no room for the view that, because of the acknowledged need for order, First Amendment protections should apply with less force on college campuses than in the community at large," this Court should grant Speech First's motion for a preliminary injunction. *Healy v. James*, 408 U.S. 169, 180 (1972).

## ARGUMENT

The University contends that Speech First lacks standing and that the harassment policy is constitutional. At the preliminary-injunction stage, the relevant questions are *likely* standing and *likely* unconstitutionality. *Fenves*, 979 F.3d at 330, 338. Likely does not

mean "guaranteed." *Providence Title Co. v. Truly Title, Inc.*, 547 F. Supp. 3d 585, 608 (E.D. Tex. 2021). But that nuance in the legal standard matters little here because Speech First is not just likely to succeed—its legal arguments are plainly correct. And the other preliminary-injunction factors are necessarily satisfied.

## I.    Speech First is likely to succeed on the merits.

### A.    Speech First likely has standing.

Speech First has associational standing at this stage if there's a likelihood "'(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.'" *Fenves*, 979 F.3d at 330. As in *Fenves*, the only disputed element is the first: whether Speech First's members likely have an injury in fact. *See id.* at 330 n.5, 338. An association's members have an injury in fact if they have an "intention to engage in a course of conduct arguably affected with a constitutional interest," their intended future conduct is "arguably proscribed by the policy in question," and "the threat of future enforcement of the challenged policies is substantial." *Id.* (cleaned up). Importantly, it is "not hard to sustain standing for a pre-enforcement challenge in the highly sensitive area of public regulations governing bedrock political speech." *Id.* at 331.

Speech First satisfies all three elements. First, its members intend to engage in "'political speech,'" which is "'certainly affected with a constitutional interest.'" *Id.*; *see* Student A Decl., ¶¶5-10; Student B Decl., ¶¶ 5-8; Student C Decl., ¶¶5-9. Second, the

"categories of speech arguably covered" by the harassment policy are incredibly "broad" and thus "arguably" cover Speech First's members' speech. *Fenves*, 979 F.3d at 332; *see* Mot. 5-6. Third, there is a "substantial" threat of the University enforcing the policy. *Fenves*, 979 F.3d at 334. When "dealing with pre-enforcement challenges to recently enacted (or, at least non-moribund) statutes that facially restrict expressive activity by the class to which the plaintiff belongs, courts will assume a credible threat of prosecution in the absence of compelling contrary evidence." *Id.* at 335. Here, the harassment policy is recently enacted, *see* Opp. 3, and there is no "compelling contrary evidence" that it will not be enforced, *Fenves*, 979 F.3d at 335. Quite the opposite, the University has warned students that it will enforce the harassment policy to punish precisely the type of speech that Speech First's members want to express here. Mot. 4.

Though it tries, the University cannot distinguish *Fenves*. There, Speech First sued the University of Texas (UT) over four of its policies, one of which was UT's harassment policy. *Fenves*, 979 F.3d at 323-34. Like here, Speech First sought a preliminary injunction and provided evidence about the protected speech its members wished to express. *Id.* at 323, 331. And like here, UT argued that Speech First lacked standing because Speech First had not established a history of past enforcement under the policies, the policies contained disclaimers that purported to protect free speech, and the policies did not prohibit Speech First's members' intended speech. *See id.* at 332-34, 336. The Fifth Circuit disagreed, finding that Speech First had standing to challenge all four policies, including UT's harassment policy. *Id.* at 338.

3

The University claims that UT's harassment policy "swept in significantly more conduct and speech" than the University's harassment policy. Opp. 14. That is wrong. UT's policy was, if anything, narrower than the University's:

| Definition of Harassment in *Fenves* | Definition of Harassment Here |
|---|---|
| Hostile or offensive speech, oral, written, or symbolic, that: | Subjecting an individual on the basis of their membership in a Protected Class to unlawful severe, pervasive, or persistent treatment that is: |
| A. is not necessary to the expression of any idea described in the following subsection ['an argument for or against the substance of any political, religious, philosophical, ideological, or academic idea is not verbal harassment even if some listeners are offended by the argument or idea']; | |
| B. is sufficiently severe, pervasive, or persistent to create an objectively hostile environment that interferes with or diminishes the victim's ability to participate in or benefit from the services, activities, or privileges provided by the University; and | • Humiliating, abusive, or threatening conduct or behavior that denigrates or shows hostility or aversion toward an individual or group; <br> • An intimidating, hostile or abusive learning, living or working environment, or an environment that alters the conditions of learning, living or working; or <br> • An unreasonable interference with an individual's academic or work performance. |
| C. personally describes or is personally directed to one or more specific individuals. | |

*Compare Fenves*, 979 F.3d at 323, *with* Hasson Decl., Ex. A at 3. Unlike UT, the University does not require the harassing speech to be "not necessary to the expression" of an argument. Unlike UT, the University covers speech that merely "*alters* the conditions of learning, living, or working." And unlike UT, the University does not require the speech to "personally describ[e]" or be "personally directed" at someone. Because Speech First had standing to challenge UT's narrower policy, it necessarily has standing to challenge the University's broader one.

The University notes that *Fenves* relied on a "detailed evidentiary record of incident reports" to find that Speech First had standing to challenge UT's bias-response team. Opp. 15. That is true, but irrelevant. The Fifth Circuit found that Speech First had standing to challenge UT's *harassment policy*—which was separate from its bias-incidents policy—even though there was no record of UT enforcing the harassment policy. *See Fenves*, 979 F.3d at 336 & n.14. Speech First had standing based on the mere "existence of the [harassment policy].'" *Id.* at 336 (quoting *Majors v. Abell*, 317 F.3d 719, 721 (7th Cir. 2003)). Indeed, because the injury is chilled speech, focusing on past enforcement "'misses the point.'" *Id.* (quoting *Speech First, Inc. v. Schlissel*, 939 F.3d 756, 766 (6th Cir. 2019)). There's nothing to enforce when "speech has already been chilled." *Schlissel*, 939 F.3d at 766. And besides, just like UT's Campus Climate Response Team, the University has apparatuses in place that encourage students to anonymously report each other's speech to the University. *See, e.g., Conduct Assessment and Response Team (CART)*, Univ. of Houston, uh.edu/cart/ (last visited Apr. 15, 2022); *Make a Report*,

Equal Opportunity Servs., Univ. of Houston, uh.edu/equal-opportunity/make-a-report/ (last visited Apr. 15, 2022).

Nor did *Fenves* suggest that Speech First had standing only because it also alleged that UT's policy was vague. While a vague policy might chill more speech than a clear one, the Fifth Circuit held that Speech First had standing to challenge UT's harassment *policy*—a policy that could not be vaguer than the University's because they are worded the same way. *Fenves* did stress that Speech First's standing was bolstered by the fact that it was bringing a facial challenge under the First Amendment, rather than an as-applied one—but that, of course, is equally true here. *See* 979 F.3d at 334-35. The University also misunderstands the facts of *Fenves*. It claims that UT's harassment policy included "broad language" like "'civil,'" "'rude,'" and "'incivility.'" Opp. 15. But those terms appeared in two other policies that Speech First challenged: an acceptable use policy and a residence hall manual. *See Fenves*, 979 F.3d at 332. The harassment policy did not contain those terms, and the Fifth Circuit held that Speech First likely had standing to challenge each of the four challenged policies.

That other students at the University of Houston apparently engage in controversial speech on campus is likewise irrelevant. *See* Opp. 6-7. Universities can "chill [First Amendment] activity" without "freez[ing] it completely," *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 500 (4th Cir. 2005). Objective chill does not turn on any particular student's "will to fight." *Id.* UT made this same point in *Fenves* to no avail. *See Fenves* Appellee's Br., 2019 WL 5296547 at *5-8.

Worse than *Fenves*, Speech First's members have heard a University official—a representative from the general counsel's office, no less—warn that the harassment policy prohibits a broad swath of protected speech. Mot. 4. The University claims that Mr. Palmer "actually acknowledged that 'hate speech' was protected by the First Amendment." Opp. 9. But that is not in dispute. *See* Mot. 4. What's troubling is what he said in the next breath. Palmer stressed that, while hate speech is protected by the First Amendment, it *is still prohibited by the harassment policy*:

> So, you might say to yourself, "well, does that mean I can go out and say anything I want, against any race, gender, or religion?" And the answer is no with regards to the University, right? Because we have policies, we have an anti-discrimination policy and anti-harassment policy so, presumably if you're saying something about a race, a religion, a gender, you're probably violating that policy. You're probably also violating the code of conduct. So that's where, *even though it's protected under free speech*, it actually . . . isn't permitted by the University.

Hasson Decl. ¶7 (emphasis added). Palmer is right about what the policy covers, but wrong about what that means. The University cannot forbid what the First Amendment protects.

The University argues that the harassment policy should be construed narrowly because the word "unlawful" implies that "the conduct must target an individual on the basis of the individual's protected class." Opp. 12-13. But that is not what the policy says. *See* Ex. A at 3. While speech that "targets a Protected Class" is an *example* of harassment, it is not a *requirement* to violate the policy. *See* Ex. A at 6. Nor would this limitation remove the chilling effect on Speech First's members. A student "targets a

Protected Class" simply by directing his speech toward that individual, and Speech First's members have expressed a desire to do exactly that. *See* Student A Decl. ¶14 ("I want to speak directly to my classmates about these topics, and I want to talk frequently and repeatedly on these issues. Given my views, I know that many of these conversations will be heated and passionate. But I want to have these conversations because I feel strongly about these issues."); Student B Decl. ¶13 (same); Student C Decl. ¶13 (same).

The University similarly argues that there is no credible threat of enforcement because the University is "dedicated to protecting free speech" and has "specifically confirmed that [it has] no intention to prosecute Speech First's members for the types of speech they allegedly wish to make." Opp. 13. But UT, too, "wrapp[ed] [itself] in the flag of its policies' paeans to the freedom of speech" and "disavow[ed] any future intention to enforce [its] policies contrary to the First Amendment." *Fenves*, 929 F.3d at 333, 337. The Fifth Circuit rightly found these assurances unconvincing. The government cannot draft an overbroad policy, chill speech, and then escape judicial review by promising to comply with the First Amendment. *Id.*; *see Saxe v. State Coll. Area Sch. Dist.*, 240 F.3d 200, 210 (3d Cir. 2001) (Alito, J.) (speech regulations "cannot be insulated from First Amendment challenge . . . based on the argument that they do no more than prohibit conduct that is already unlawful"); *accord ACLU v. Fla. Bar*, 999 F.2d 1486, 1495 (11th Cir. 1993); *Dambrot v. Cent. Mich. Univ.*, 55 F.3d 1177, 1182 (6th Cir.

1995). The First Amendment does not leave students "at the mercy of *noblesse oblige*." *United States v. Stevens*, 559 U.S. 460, 480 (2010).

The University also contends that Speech First's members will not arguably violate the harassment policy because their speech could never "objectively interfer[e] with an individual's ability to participate in the benefits of the University." Opp. 13. But UT's harassment policy also had an "objective" component, requiring the speech to "create an objectively hostile environment that interferes with or diminishes the victim's ability to participate in or benefit from the services, activities, or privileges provided by the University." *Fenves*, 979 F.3d at 323. Yet the Fifth Circuit found that Speech First had standing. *Id.* at 327, 338. Rightly so. "Objective" is no protection when the terms it modifies are so broad—*i.e.*, here where the University's policy covers one-off incidents, covers repeated minor instances, and merely requires the speech to "interfer[e]" or "limi[t]" anything someone does on campus. Ex. A at 6.

Finally, the University's heavy reliance on *Speech First v. Sands* is telling. True, the district court in *Sands* found that Speech First lacked standing to challenge Virginia Tech's harassment policy, and parts (but not all) of its reasoning could apply here. *See* 2021 WL 4315459 (W.D. Va. Sept. 22, 2021). But the court recognized that its holding *directly conflicted* with the Fifth Circuit's decision in *Fenves*. *See id.* at *15 ("In so ruling, the court recognizes that it again parts company with the Fifth and Sixth Circuits' decisions regarding harassment-related policies."). Unlike the Western District of Virginia, this

9

Court has no freedom to disregard Fifth Circuit precedent. Speech First's members likely have standing to challenge the harassment policy.

### B.     The harassment policy is likely unconstitutional.

The University's defense on the merits is equally unpersuasive. "In the First Amendment context," courts recognize a special kind of facial challenge based on overbreadth. *Ams. for Prosperity Found. v. Bonta (AFPF)*, 141 S. Ct. 2373, 2387 (2021). Namely, a regulation is facially invalid if "'a substantial number of its applications are unconstitutional'" under the Free Speech Clause. *Id.* The key question is whether "the statute itself" poses a "realistic danger" of chilling constitutionally protected speech. *Members of City Council of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 801 (1984). The "risk of a chilling effect" is enough "because First Amendment freedoms need breathing space to survive." *AFPF*, 141 S. Ct. at 2389 (cleaned up). The overbreadth doctrine requires regulations to be drafted narrowly so they are not "susceptible of application to protected expression." *Gooding v. Wilson*, 405 U.S. 518, 522 (1972).

The Fifth Circuit has warned that campus speech codes, in particular, are especially likely to be unconstitutionally overbroad. There has been a "consistent line of cases that have uniformly found campus speech codes unconstitutionally overbroad or vague." *Fenves*, 979 F.3d at 338-39 & n.17 (listing cases). As the Fifth Circuit has stressed, "[i]n our current national condition," in which university "leaders, in a spirit of panicked damage control, are delivering hasty and disproportionate punishment

10

instead of considered reforms, courts must be especially vigilant against assaults on speech in the Constitution's care." *Id.* (citation omitted).

The University has not bucked the trend of enacting unconstitutional speech codes. Its harassment policy is facially overbroad. "Where pure expression is involved," regulations of discriminatory harassment "steer[] into the territory of the First Amendment" and "regulate speech on the basis of its expressive content." *DeAngelis v. El Paso Mun. Police Officers Ass'n*, 51 F.3d 591, 596-97 & n.7 (5th Cir. 1995); *accord Wollschlaeger v. Gov'r*, 848 F.3d 1293, 1307 (11th Cir. 2017) (en banc) ("antiharassment laws, insofar as they regulate speech based on content, are subject to First Amendment scrutiny"); *Healy*, 408 U.S. at 180 (universities have the right to "'prescribe and control conduct'" on campus, but have no right to prescribe and control speech). When anti-harassment regulations "'attempt to regulate oral or written expression,'" they "'impose[] content-based, viewpoint-discriminatory restrictions on speech,'" and thus receive "the most exacting First Amendment scrutiny." *DeJohn v. Temple Univ.*, 537 F.3d 301, 316 (3d Cir. 2008); *DeAngelis*, 51 F.3d at 596-97; *Saxe*, 240 F.3d at 207.

There is no question that the harassment policy proscribes "pure expression." *DeAngelis*, 51 F.3d at 596-97. A student violates the policy when his speech "subject[s] an individual on the basis of their membership in a Protected Class to unlawful severe . . . treatment" that is "humiliating" or "denigrat[ing]" or "shows . . . aversion toward an individual or group." Ex. A at 3. A transgender student could find it severely "denigrat[ing]," Ex. A at 3, when another student tells her that "human beings are

created either male or female and . . . someone cannot 'transition' from one sex to the other based on whether he or she 'feels' like a man or a woman," Student A Decl. ¶7. A recent immigrant student could find it "humiliating," Ex. A at 3, when another student tells him that "we need to deport those who are living in the country illegally," Student B Decl. ¶5. And an African-American student could experience "aversion toward an individual or group," Ex. A at 3, when she is told that "activist groups like the Black Lives Matter organization are corrosive to society," Student C Decl. ¶7. The litany of protected speech that is prohibited by the policy goes on and on. *See* Student A Decl. ¶¶5-10; Student B Decl. ¶¶5-8; Student C Decl. ¶¶5-9.

To be sure, the statements that Speech First's members want to make are controversial and could make other students feel uncomfortable. But under the First Amendment, "uncomfortable message[s]" are a "virtue, not a vice." *McCullen v. Coakley*, 573 U.S. 464, 476 (2014). In a free society, citizens "must tolerate insulting, and even outrageous, speech.'" *Boos v. Barry*, 485 U.S. 312, 322, (1988). And this principle is "nowhere more vital than in the community of American [universities]." *Healy*, 408 U.S. at 180.

The University nevertheless believes that it can prohibit this type of speech under *Tinker v. Des Moines Independent Community School District*, 393 U.S. 503 (1969), and it expresses surprise that "*Tinker* . . . isn't even mentioned in Speech First's papers." Opp. 2. But that is no accident. *Tinker* was a case about *children* in junior high and high school—not adults in college. *See Tinker*, 393 U.S. at 504-05. Courts have long

recognized the "difference between the extent that a school may regulate student speech in a public university setting as opposed to that of a public elementary or high school." *DeJohn*, 537 F.3d at 315-16. Thus, "universities have significantly *less leeway* in regulating student speech than public elementary or high schools." *McCauley v. Univ. of V.I.*, 618 F.3d 232, 247 (3d Cir. 2010) (emphasis added); *accord Mahanoy Area Sch. Dist. v. B. L. ex rel. Levy*, 141 S. Ct. 2038, 2049 n.2 (2021) (Alito, J., concurring) (stressing the differences in "age, independence, and living arrangements" of college students versus grade schoolers). Far from an insulated safe space, the "college campus" must "serve as a marketplace of ideas and a forum for the robust exchange of different viewpoints." *Solid Rock Found. v. Ohio State Univ.*, 478 F. Supp. 96, 102 (S.D. Ohio 1979).

True, the University has statutory obligations under Title VI and Title IX, but it has an overriding *constitutional* obligation to respect students' free-speech rights. *See UWM Post, Inc. v. Bd. of Regents of Univ. of Wisconsin Sys.*, 774 F. Supp. 1163, 1177 (E.D. Wis. 1991); *Bair v. Shippensburg Univ.*, 280 F. Supp. 2d 357, 371-72 (M.D. Pa. 2003). As explained, Mot. 8-10, the Supreme Court's decision in *Davis ex rel. LaShonda D. v. Monroe County Board of Education* shows universities how to draw the line between improper conduct (which the University can regulate) and speech (which it cannot). 526 U.S. 629, 649, 652-53 (1999).

The University asserts that *Davis* "did not draw any such line" because "*Davis* [was] not a First Amendment case." Opp. 21. Not quite. *See* Mot. 8. Although the plaintiff in *Davis* didn't bring a cause of action under the First Amendment, the Court

had the First Amendment in mind when it defined "harassment" under Title IX. In response to "the dissent" from Justice Kennedy, which raised First Amendment concerns about campus speech codes, the Court expressly "acknowledged" that universities face "legal constraints on their disciplinary authority." *Davis*, 526 U.S. at 649, 652-53. Citing the dissent four times, the Court insisted that "it would be entirely reasonable for a [university] to refrain from a form of disciplinary action that would expose it to *constitutional . . .* claims." *Id.* (emphasis added). And the Court "repeated the 'severe and pervasive' formulation five times" to make clear the speech-protective line it was drawing. *Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial* Assistance, 85 Fed. Reg. 30,026, 30,149 (May 19, 2020).

Here, the University concedes that its policy prohibits more speech than allowed by *Davis*. *See* Opp. 24 (asking that any injunction "be limited to a requirement that the Policy be enforced consistent with the standard in *Davis*"). That should end the matter.

The University complains that the *Davis* standard is "unworkable" because it would prevent administrators from "regulat[ing] harassing speech *until* that speech has reached the point the school is potentially liable for damages under Title IX." Opp. 22. But that is precisely what the University does already, given that it has a separate Title IX harassment policy that adopts the *Davis* standard verbatim. *See* Ex. D at 32-33. The University does not explain why it does one thing for purposes of Title IX and another thing for purposes of other kinds of harassment. More importantly, the University misunderstands its legal obligations. Universities, not students, are subject to Title IX;

14

harassing speech *by students* does not violate any federal statute. What violates Title IX is when universities "ac[t] with deliberate indifference to known acts" of student-on-student harassment. *Davis*, 526 U.S. at 633. Nothing in *Davis* or Title IX authorizes, much less requires, universities to preemptively "regulate" students' speech. *Fenves*, 979 F.3d at 337 n.16. Nor could a federal statute trump the Constitution, in any event. *UWM Post*, 774 F. Supp. at 1177.

The University's insistence that it needs its harassment policy to comply with federal law is surprising. Although Title VI and Title IX have existed for more than 50 years, the University didn't even adopt its harassment policy until 2012. *See* Koch Decl. Ex. B at 2-3. The University likely wouldn't concede that it was violating federal law for four decades. Its harassment policy is also *broader* than necessary to comply with Title VI and Title IX. *See* 85 Fed. Reg. at 30,149. It covers "protected classes" other than race and sex, and it adopts a definition of harassment that goes beyond the *Davis* standard. The University knows this, which is why maintains a separate harassment policy for purposes of Title IX that adopts the *Davis* standard verbatim. *See* Ex. D at 32-33. The University has no good reason for layering an overbroad, viewpoint-discriminatory policy on top. Indeed, the University concedes that a harassment policy that complied with *Davis* would "allow the University to pursue its goal of ensuring students and staff are able to enjoy an environment free from unlawful discrimination and harassment." Opp. 24.

The University relies on Title VII cases using the "severe or pervasive" standard to justify its harassment policy. Opp. 21. But as explained, Mot. 8, those cases apply to employees in the workplace, not students at a university. "Courts . . . must bear in mind that schools are unlike the adult workplace." *Davis*, 526 U.S. at 651. Workplaces can ban lengthy political debates and expressions of offensive or controversial opinions, but universities cannot. *See* 85 Fed. Reg. at 30,037. Exporting Title VII standards to the university setting, as the University proposes, would "broaden[] the scope of prohibited speech and expression" and "chill and infringe upon the First Amendment freedoms of students." *Id.*

The University relies heavily on *Speech First v. Cartwright*, 2021 WL 3399829, at *6 (M.D. Fla. July 29, 2021). As an initial matter, *Cartwright* was wrongly decided and should be reversed by the Eleventh Circuit. *See* No. 21-12583 (11th Cir.). In any event, *Cartwright* is distinguishable. For one, it wrongly applied the *Tinker* standard for schoolchildren to restrictions on the speech of university students. For another, it turned entirely on the court's determination that the University of Central Florida's discriminatory-harassment policy—which tracks the harassment policy here—does not apply to speech at all. *See Cartwright*, 2021 WL 3399829 at *6. But the Fifth Circuit has already held that such policies do cover protected speech. *See Fenves*, 979 F.3d at 330-35. Thus, like the Western District of Virginia's decision in *Sands*, the Middle District of Florida's decision in *Cartwright* is directly at odds with Fifth Circuit precedent.

Finally, the University argues that the policy is not viewpoint discriminatory because it applies to "harassment of any kind." Opp. 18. But the policy does not forbid "harassment of any kind"—it specifically prohibits speech that "*denigrates* or *shows hostility or aversion toward* an individual or group" "on the basis of . . . membership in a Protected Class." Ex. A at 3 (emphasis added). The policy bans harassing speech that is negative toward a protected class, but allows harassing speech that is not based on one of those classes or that is positive toward them. In other words, harassment that does not "invoke race, color, creed, religion, or gender—aspersions upon a person's mother, for example—would seemingly be usable *ad libitum* in the placards of those arguing in favor of racial, color, etc., tolerance and equality, but could not be used by those speakers' opponents." *R.A.V. v. City of St. Paul*, 505 U.S. 377, 391 (1992). That's classic viewpoint discrimination. *Id.* at 392. The policy thus fails strict scrutiny because a ban on harassment that was "not limited to the favored topics" would accomplish "precisely" the same goals. *Id.* at 395-96.

## II.  Speech First satisfies the remaining preliminary injunction criteria.

Because Speech First is likely to succeed on the merits of its First Amendment claim, the remaining preliminary-injunction factors are necessarily satisfied. The "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976); *accord Texans for Free Enter. v. Texas Ethics Comm'n*, 732 F.3d 535, 539 (5th Cir. 2013). And the balance of

17

the equities and the public interest always favor free speech protections. *McDonald v. Longley*, 4 F.4th 229, 255 (5th Cir. 2021); *Texans for Free Enter.*, 732 F.3d at 539.

The University contends that a preliminary injunction would "capsize the University's policies and administration of its schools" and subject "students, staff, and faculty to harassment with no potential recourse." Opp. 2, 24. Yet the University didn't even have a harassment policy as recently as 2012, and it could bring its policy in line with *Davis* tomorrow. The University is free to protect its students from harmful *conduct*. *See, e.g.,* Ex. B at 4-6 (prohibiting "stalking," "destruction of property," "hazing," "sexual misconduct," intentional infliction of "bodily harm," and other types of misconduct). What it cannot do is punish student *speech* that is fully protected by the First Amendment.

## CONCLUSION

The Court should grant Speech First's motion and preliminarily enjoin Defendants from enforcing the harassment policy during this litigation.

Dated: April 15, 2022                    Respectfully submitted,

                                         */s/ J. Michael Connolly*
                                         J. Michael Connolly (*pro hac vice*)
                                         Cameron T. Norris (*pro hac vice*)
                                         James F. Hasson (TX Bar No. 24109982)
                                         CONSOVOY MCCARTHY PLLC
                                         1600 Wilson Blvd., Suite 700
                                         Arlington, VA 22209
                                         (703) 243-9423
                                         mike@consovoymccarthy.com
                                         cam@consovoymccarthy.com
                                         james@consovoymccarthy.com

## CERTIFICATE OF SERVICE

I certify that on April 15, 2022, I electronically filed the foregoing with the Clerk of Court using the CM/ECF System, which will automatically send e-mail notification to all counsel of record.

*/s/ J. Michael Connolly*