# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF TEXAS
# HOUSTON DIVISION

| | |
|---|---|
| SPEECH FIRST, INC.,<br>*Plaintiff,*<br><br>v.<br><br>RENU KHATOR, *et al.,*<br>*Defendants.* | Case No. 4:22-cv-582 |

## NOTICE OF SUPPLEMENTAL AUTHORITY

Speech First has moved this Court to preliminarily enjoin the University's harassment policy. *See* Mot. (Doc. 3-1). The University has stressed that UCF's "similar" harassment policy was upheld by the district court in *Speech First, Inc. v. Cartwright*, 2021 WL 3399829, at *6 (M.D. Fla. July 29, 2021). Opp. (Doc. 18) 17. In reply, Speech First warned that *Cartwright* was "wrongly decided" and "should be reversed by the Eleventh Circuit." Reply (Doc. 19) 16. Yesterday, the Eleventh Circuit agreed. Its opinion reversing the district court is attached as Exhibit A.

The Eleventh Circuit's opinion in *Cartwright* rejects every one of the arguments that the University raises here.

- **Standing**: The Eleventh Circuit held that Speech First had standing to challenge UCF's harassment policy. Ex. A at 20-23. Neither the text of the policy nor the speech in question were meaningfully different than this case. *See* Mot. 2-6.

- **Overbreadth**: The Eleventh Circuit held that UCF's harassment policy was overbroad, given its "sweeping" breadth, its application to core political speech, and its use of capacious terms like "alters." Ex. A at 29-31. The University's policy has that same breadth. *See* Mot. 10-11.

1

- **Content & Viewpoint Discrimination**: The Eleventh Circuit found that UCF's policy discriminated based on content and viewpoint. Ex. A at 31-34. The University's policy does too for the same reasons. *See* Mot. 11-12; Reply 17.

- ***Tinker***: The Eleventh Circuit rejected the notion that *Tinker* somehow authorized UCF's harassment policy. Ex. A at 34-35 n.6. The University raises that same mistaken defense here. *See* Reply 12-13.

- **Injunction**: The Eleventh Circuit found that, on balance, the preliminary-injunction factors required that UCF's harassment policy be enjoined. Ex. A at 35-36. Those factors also favor Speech First here for the same reasons. *See* Mot. 12-13; Reply 17-18.

In short, the University was right that the harassment policy in *Cartwright* is "similar" to the harassment policy here. Opp. 17. But now that the Eleventh Circuit has persuasively ruled for Speech First in *Cartwright*, that similarity should lead this Court to do the same.

Dated: April 22, 2022

Respectfully submitted,

*/s/ J. Michael Connolly*
J. Michael Connolly (*pro hac vice*)
Cameron T. Norris (*pro hac vice*)
James F. Hasson (TX Bar No. 24109982)
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Suite 700
Arlington, VA 22209
(703) 243-9423
mike@consovoymccarthy.com
cam@consovoymccarthy.com
james@consovoymccarthy.com

2

## CERTIFICATE OF SERVICE

I hereby certify that on April 22, 2022, I filed the foregoing document through

the CM/ECF system, which served all parties.

Dated: April 22, 2022                                        */s/ J. Michael Connolly*

# EXHIBIT A

[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 21-12583

_____

SPEECH FIRST, INC.,

                                        Plaintiff-Appellant,

*versus*

ALEXANDER CARTWRIGHT,
in his individual capacity and his official capacity
as President of the University of Central Florida,

                                        Defendant-Appellee,

DANA JUNTENEN,
in her official capacity as Director of the
University of Central Florida Office of Student

2                    Opinion of the Court                    21-12583

Rights and Responsibilities and Assistant
Dean of Students, et al.,

                                                            Defendants.

_____

Appeal from the United States District Court
for the Middle District of Florida
D.C. Docket No. 6:21-cv-00313-GAP-GJK

_____

Before Newsom and Marcus, Circuit Judges, and Story,* District
Judge.

Newsom, Circuit Judge:

        In this appeal from the denial of a request for a preliminary
injunction, we are asked to decide whether two speech-related pol-
icies promulgated by the University of Central Florida—one that
prohibits multiple forms of expression that are deemed to consti-
tute "discriminatory harassment" and another that aims to address
so-called "bias-related incidents"—likely violate the First Amend-
ment. We must also decide, as a threshold matter, whether the

_____

* Honorable Richard W. Story, United States District Judge for the Northern
District of Georgia, sitting by designation.

plaintiff—an organization called Speech First, Inc.—has standing to challenge the policies' constitutionality.

We hold (1) that Speech First has standing to sue because the challenged policies chill its members' speech and (2) that the discriminatory-harassment policy likely violates the First Amendment on the grounds that it is an overbroad and content- and viewpoint-based regulation of constitutionally protected expression. Because the district court never considered the bias-related-incidents policy's constitutionality on the merits—having erroneously concluded that Speech First lacked standing to challenge it—we remand for a determination of that issue.

## I

## A

Speech First, Inc. is a voluntary member organization dedicated to protecting students' free-speech rights. It represents students who attend universities across the country, including the University of Central Florida. Several of Speech First's UCF-based members have attested that they desire to express their beliefs and opinions about a range of topics but are inhibited from doing so by two University policies, which we'll call the "discriminatory-harassment" and "bias-related-incidents" policies, respectively, and which we'll describe in detail below.

One student, for instance—identified as "Student A" in Speech First's complaint—says that he wishes to express his views that "abortion is immoral," that the government "should not be

able to force religious organizations to recognize marriages with which they disagree," that "affirmative action is deeply unfair," that "a man cannot become a woman because he 'feels' like one," and that "illegal immigration is dangerous." He asserts that he desires to "speak passionately" about those (and other) topics, that he wishes to "engage in open and robust intellectual debate" about them, and that he hopes to "encourage [other students] to change their minds or, at a minimum, to understand his views." Finally, he says that he "does not fully express himself or talk about certain issues because he fears" that sharing his beliefs may subject him to the University's discriminatory-harassment policy, bias-related-incidents policy, or both. Two other UCF students—identified as "Student B" and "Student C"—have expressed similar desires and fears.

## B

Before we go any further, we should describe the challenged policies in some detail. Rather than characterize them—and in the interest of providing the fullest possible context—we will lay out their relevant provisions in full.

## 1

First, the discriminatory-harassment policy. As its name indicates, the policy prohibits "discriminatory harassment," which it defines in the following terms:

> Discriminatory harassment consists of verbal, physical, electronic or other conduct based upon an

individual's race, color, ethnicity, national origin, re-
ligion, non-religion, age, genetic information, sex (in-
cluding pregnancy and parental status, gender iden-
tity or expression, or sexual orientation), marital sta-
tus, physical or mental disability (including learning
disabilities, intellectual disabilities, and past or pre-
sent history of mental illness), political affiliations,
veteran's status (as protected under the Vietnam Era
Veterans' Readjustment Assistant Act), or member-
ship in other protected classes set forth in state or fed-
eral law that interferes with that individual's educa-
tional or employment opportunities, participation in
a university program or activity, or receipt of legiti-
mately-requested services meeting the description of
either *Hostile Environment Harassment* or *Quid Pro
Quo Harassment*, as defined [below].

Discriminatory harassment may take many forms, in-
cluding verbal acts, name-calling, graphic or written
statements (via the use of cell phones or the Internet),
or other conduct that may be humiliating or physi-
cally threatening.

The policy, in turn, defines "Hostile Environment Harass-
ment" as follows:

Discriminatory harassment that is so severe or perva-
sive that it unreasonably interferes with, limits, de-
prives, or alters the terms or conditions of education
(e.g., admission, academic standing, grades, assign-
ment); employment (e.g., hiring, advancement, as-
signment); or participation in a university program or

activity (e.g., campus housing), when viewed from both a subjective and objective perspective.

The policy states that "[i]n evaluating whether a hostile environment exists, the university will consider the totality of known circumstances, including, but not limited to" the following factors:

• The frequency, nature and severity of the conduct;

• Whether the conduct was physically threatening;

• The effect of the conduct on the complainant's mental or emotional state;

• Whether the conduct was directed at more than one person;

• Whether the conduct arose in the context of other discriminatory conduct or other misconduct;

• Whether the conduct unreasonably interfered with the complainant's educational or work performance and/or university programs or activities; and

• Whether the conduct implicates concerns related to academic freedom or protected speech.

The policy's definition of "Hostile Environment Harassment" goes on to state (1) that "[a] hostile environment can be created by pervasive conduct or by a single or isolated incident, if sufficiently severe," (2) that "[t]he more severe the conduct, the less need there is to show a repetitive series of incidents to prove a hostile environment, particularly if the conduct is physical," and (3) that "an isolated incident, unless sufficiently serious, does not amount to Hostile Environment Harassment."

21-12583                Opinion of the Court                7

There is one last piece of the discriminatory-harassment puzzle.  Referencing the discriminatory-harassment policy, UCF's Student Handbook states that "[s]tudents are prohibited" not only from engaging in the prohibited conduct themselves, but also from "[c]ondoning or encouraging acts of harmful behavior as defined [in the discriminatory-harassment policy] or failing to intervene during an act of harmful behavior while it is occurring."

\*  \*  \*

So, in sum:  The discriminatory-harassment policy prohibits "verbal, physical, electronic, or other conduct" based on a long list of characteristics including, among others, "religion [or] non-religion," "genetic information," and "political affiliation[]."  The policy applies to any conduct that, for instance, "unreasonably . . . alters" another student's "participation in a university program or activity."  It specifies that discriminatory harassment "may take many forms"—including, broadly, "verbal acts, name-calling, graphic or written statements . . . or other conduct that may be humiliating"—and it utilizes a "totality of known circumstances" approach, based on a non-exhaustive list of factors, to determine whether a speaker's expression satisfies the "unreasonabl[e] . . . alter[ation]" standard.  Lastly, the policy prohibits students not only from committing the specified acts, but also from "[c]ondoning," "encouraging," or even "failing to intervene" to stop them.

**2**

Separate from the discriminatory-harassment policy—but seemingly aimed at addressing similar issues—UCF maintains a policy which seeks to prevent and redress what it calls "bias-related incidents." The "Bias-Related Incidents" policy has several parts. First, it defines the key term—"bias-related incident"—as follows:

> A bias-related incident is any behavior or action directed towards an individual or group based upon actual or perceived identity characteristics or background. This bias motivates an individual to act in an offensive manner towards an individual or group including but not limited to: race, sex (including gender identity/expression), color, religion, ancestry, national origin, age, disability, veteran status, military status, or sexual orientation. Such acts may result in creating a hostile environment and may have a negative psychological, emotional, or physical impact on an individual, group, and/or community.

Second, the policy provides that "[b]ias-related incidents occur without regard to whether the act is legal, illegal, intentional, or unintentional," and that such an incident need "not necessarily rise to the level of a crime, a violation of state law, university policy, or the student code of conduct." Rather, a "bias act" is one that "may contribute to creating an unsafe, negative, unwelcoming environment [for] the victim, or anyone who shares the same social identity as the victim, and/or community members at the university."

Third, the bias-related-incidents policy states that "[i]ncidents which occur on campus that are not covered by formal policies and procedures but have the effect of harming individuals or groups may be addressed by the Just Knights Response Team (JKRT) protocol"—of which more below. That "protocol may be initiated in cases when it is clear that the incidents have harmful effects on persons or groups based upon their race, sex (including gender identity/expression), color, religion, ancestry, national origin, age, disability, veteran status, military status, or sexual orientation."

Finally, the policy provides a non-exhaustive list of "types of bias-related incidents." They "may include (but are not limited to)" any of 13 behaviors, ranging from "physical injury" and "stalking," on one end of the spectrum, to "graffiti [and] signs," "confrontation," and "gestures," on the other end.

As just noted, the bias-related-incidents policy is implemented by the JKRT, which is made up of UCF students, faculty, and staff. University staff members who serve on the JKRT include representatives from the offices of Student Development and Enrollment Services, Housing and Residence Life, Social Justice and Advocacy, Faculty Relations, and the UCF Police Department.

UCF's website describes the JKRT as follows:

The JKRT . . . is here to provide assistance in the unfortunate event that you have experienced or witnessed a hate or bias related incident. This site is designed to allow the reporting of bias incidents to the

JKRT team to ensure the most appropriate university response.

UCF is also committed to tracking patterns of bias and other incidents at the University that might prevent the community from thriving. It is our goal, as a team, to effect positive change in our campus community by providing a platform for individuals to report hurtful actions that have occurred. In return, we will create an open and transparent university community response to the handling of these incidents.

JKRT is intended to be a resource for anyone who wants to examine issues of bias, discrimination, or hate. Whatever your reasons are for visiting this site, please be assured that UCF holds as one of its goals to create a more inclusive and diverse campus. We are also committed to providing a safe and welcoming living and learning community for all our students.

The website goes on to explain the JKRT's "Purpose Statement" in the following terms:

The purpose of the *Just Knights Response Team* (JKRT) is to act as a clearinghouse for any bias-related incidents that may occur on UCF campuses. In this role, the JKRT will receive, monitor, refer, and, as necessary, coordinate university resources to these incidents that impact the university community.

The team, made up of UCF faculty, staff, and students, provides a safe space for students, who are witnesses to or targets of bias, to communicate

experiences, to ensure comprehensive responses, and
proactively address issues of civility and respect.

And it describes the JKRT's "Policy" as follows:

> The Just Knights Response Team (JKRT) is an inter-
> divisional team that assesses bias incidences in order
> to coordinate university resources for the creation of
> effective interventions and future incident prevention
> programming.  The JKRT creates timely interven-
> tions to incidents that are sensitive to the rights of all
> parties involved.  It is intended that any JKRT pro-
> gramming or intervention will be educational at its
> core.  It will involve a variety of activities including
> discussion, mediation, training, counseling and con-
> sensus building.  Through the voluntary participation
> of the persons involved in and impacted by bias inci-
> dences, the JKRT's interventions and prevention pro-
> gramming will foster a sense of civility and campus
> community encompassing respect and understanding
> that supports a multicultural and diverse campus en-
> vironment.

A student who feels that he has been the victim of a bias-
related incident can report it anonymously through a complaint
form on the JKRT's website.  The complainant is directed to de-
scribe the incident (date, location, etc.), to "list the individuals in-
volved," and to specify his or her "desired outcome."  The JKRT's
website warns that the information provided by a complainant
"may be shared with the Office of Student Conduct," the "Office of

12                    Opinion of the Court                    21-12583

Student Rights and Responsibility," or the "UCF Police Depart-
ment."[1]

---

[1] When a UCF student is reported to have engaged in a bias-related incident,
the JKRT sends that student the following email:

> Greetings,
>
> My name is {INSERT NAME}.  The University of Cen-
> tral Florida is committed to tracking patterns of bias and other
> incidents at the university that might prevent the community
> from thriving.  I am a university employee who serves on the
> Just Knights Response Team (JKRT).
>
> The Just Knights Response Team (JKRT) is an inter-
> divisional team that assesses bias incidences in order to coordi-
> nate university resources for the creation of effective interven-
> tions and future incident prevention programming.  The JKRT
> creates timely interventions for incidents that are sensitive to
> the rights of all parties involved.  It is intended that any JKRT
> programming or intervention will be educational at its core.
> Interventions involve a variety of activities including discus-
> sion, mediation, training, counseling, and consensus-building.
> Through the voluntary participation of the persons involved
> in and impacted by bias incidences, the JKRT's interventions
> and prevention programming will foster a sense of civility and
> campus community encompassing respect and understanding
> that supports a multicultural and diverse campus environ-
> ment.
>
> Please note, JKRT is not an extension of UCF Human
> Resources nor the Office of Student Rights and Responsibili-
> ties.  We have no authority to dispense punitive measures.  We
> value anonymity and privacy, however, at times there is cer-
> tain information that we must disclose to other university

21-12583            Opinion of the Court            13

\*   \*   \*

So again, to sum up:  The bias-related-incidents policy cre-
ates a mechanism by which a UCF student can be anonymously
accused of an act of "hate or bias"—*i.e.*, an "offensive" act, even if
"legal" and "unintentional," that is directed toward another based
on any of a number characteristics that echo (but do not precisely
mirror) those listed in the discriminatory-harassment policy.  The
JKRT "monitor[s]" and "track[s]" bias-related incidents, "coordi-
nate[s]   university   resources,"   marshals   a   "comprehensive

_____

officers (ex. Title IX violations, criminal activity and/or immi-
nent threats).

    We have received a report of an incident you may have
been involved in or reported.  I would like the opportunity to
speak with you regarding this matter.  Your participation is
voluntary.

    If you are interested in speaking with me, please reply
back with a preferred contact number.  I will call you to sched-
ule a time for us to meet or speak via the phone.  If I do not
receive a reply within two weeks, I will assume you do not
have an interest in speaking with me and will close out this
JKRT case.

    I look forward to hearing from you.

{INSERT NAME}
University of Central Florida
jkrt@ucf.edu

response[]," and, where necessary, coordinates "interventions" among affected parties.

## C

Speech First brought suit in the Middle District of Florida, contending (as relevant here) that the discriminatory-harassment and bias-related-incidents policies violate the First Amendment. In particular, Speech First alleged that both policies are unconstitutionally overbroad and that the discriminatory-harassment policy also impermissibly restricts speech based on content and viewpoint.

Shortly after filing suit, Speech First sought a preliminary injunction, which the district court refused. As an initial matter, the court held that Speech First lacked Article III standing to challenge the bias-related-incidents policy. The court reasoned that because the JKRT, which implements the policy, "has no authority to discipline students and cannot compel students to engage with it," its conduct cannot (absent evidence to the contrary) "objectively chill" student expression. Accordingly, the court concluded that Speech First had "failed to show that the JKRT creates a reasonable fear of prosecution" and, therefore, had failed to "establish its [m]embers' standing to challenge the JKRT at the preliminary injunction stage." The district court held that Speech First had standing to challenge the discriminatory-harassment policy because "UCF can discipline students for violating" it, but it rejected Speech First's arguments on the merits. In particular, the court held that the policy could "only be read to reach unprotected conduct" and,

accordingly, that Speech First's members "cannot reasonably be-
lieve that they would be punished for simply expressing unpopular
viewpoints."[2]

## II

We begin, as we must, by determining whether Speech First
has the requisite standing to challenge UCF's policies.  An associa-
tion like Speech First "has standing to bring suit on behalf of its
members when its members would otherwise have standing to sue
in their own right, the interests at stake are germane to the organ-
ization's purpose, and neither the claim asserted nor the relief re-
quested requires the participation of individual members in the
lawsuit."  *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC),
Inc.*, 528 U.S. 167, 181 (2000).  Here, all seem to agree that the
standing question turns on whether Speech First's members would
have standing to sue on their own.

───────────────

[2] "We review standing determinations *de novo.*"  *BBX Cap. v. Fed. Deposit
Ins. Corp.*, 956 F.3d 1304, 1312 (11th Cir. 2020) (per curiam).  We review "the
district court's decision to deny a preliminary injunction for abuse of discre-
tion, though we review and correct errors of law without deference to the
district court."  *Brown v. Sec'y, U.S. Dep't of Health & Hum. Servs.*, 4 F.4th
1220, 1224 (11th Cir. 2021) (quotation marks omitted).  "A district court abuses
its discretion when its factual findings are clearly erroneous, when it follows
improper procedures, when it applies the incorrect legal standard, or when it
applies the law in an unreasonable or incorrect manner."  *Wreal, LLC v. Am-
azon.com, Inc.*, 840 F.3d 1244, 1247 (11th Cir. 2016).

### A

The tripartite test for Article III standing, as articulated by the Supreme Court, is well known:

> *First*, the plaintiff must have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical. *Second*, there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court. *Third*, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992) (cleaned up); *see also Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016); *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021). "[E]ach element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation." *Lujan*, 504 U.S. at 561. Because this case hasn't progressed past the pleading stage, "general factual allegations of injury" may suffice so long as they "plausibly and clearly allege a concrete injury." *Muransky v. Godiva Chocolatier, Inc.*, 979 F.3d 917, 924 (11th Cir. 2020) (en banc) (quotation omitted).

There is no doubt—or dispute—that the members' claimed injury is "concrete and particularized" within the meaning of what we'll call *Lujan*'s prong (1a) because they have alleged a deprivation of their First Amendment right to free speech.  *See Pedro v. Equifax, Inc.*, 868 F.3d 1275, 1279 (11th Cir. 2017) ("[V]iolation of the right to free speech . . . can be concrete."); *Otto v. City of Boca Raton*, 981 F.3d 854, 870 (11th Cir. 2020) (same); *see also Spokeo*, 578 U.S. at 340 (citing *Pleasant Grove City v. Summum*, 555 U.S. 460 (2009) for the proposition that free-speech violations are concrete injuries); *TransUnion*, 141 S. Ct. at 2204 (same).  Nor is there any real dispute that the members' injury is "traceable" to UCF's policies within the meaning of *Lujan*'s prong (2) or that it is "redress[able]" within the meaning of prong (3).

The standing question here thus turns on whether the members' injury is "imminent, not conjectural or hypothetical," within the meaning of *Lujan*'s prong (1b).  In answering that question, we must first acknowledge a bit of dissonance in the doctrine.  In *Susan B. Anthony List v. Driehaus*, the Supreme Court enumerated three criteria that, as a general matter, govern a plaintiff's standing to bring the sort of pre-enforcement challenge that Speech First has brought here:  The plaintiff must show (1) that he has "an intention to engage in a course of conduct arguably affected with a constitutional interest," (2) that his conduct is "arguably proscribed," and (3) that he is subject to "a credible threat of enforcement."  573 U.S. 149, 159, 162 (2014) (cleaned up).  The district court here held that Speech First's standing turned on the third, credible-threat-of-

18                    Opinion of the Court                    21-12583

enforcement requirement: Because "UCF can discipline students for violating" the discriminatory-harassment policy, it reasoned that Speech First had standing to challenge it; but because "the JKRT does not have the independent authority to discipline students," it concluded that Speech First lacked standing to challenge the bias-related-incidents policy.

Before addressing the district court's conclusions, we pause to clarify our own pre-enforcement-challenge doctrine, at least as it applies in First Amendment cases. We have long emphasized that "[t]he injury requirement is most loosely applied—particularly in terms of how directly the injury must result from the challenged governmental action—where [F]irst [A]mendment rights are involved, because of the fear that free speech will be chilled even before the law, regulation, or policy is enforced." *Hallandale Pro. Fire Fighters Loc. 2238 v. City of Hallandale*, 922 F.2d 756, 760 (11th Cir. 1991). More recently—and specifically—we held that "[l]itigants who are being 'chilled from engaging in constitutional activity' . . . suffer a discrete harm independent of enforcement, and that harm creates the basis for our jurisdiction." *Dana's R.R. Supply v. Att'y Gen., Fla.*, 807 F.3d 1235, 1241 (11th Cir. 2015). Therefore—and most recently—we stressed that "[w]here the alleged danger of legislation is one of self-censorship, harm can be realized even without an actual prosecution." *Wollschlaeger v. Governor, Fla.*, 848 F.3d 1293, 1305 (11th Cir. 2017) (en banc) (quotation marks omitted).

Accordingly, to determine whether a First Amendment plaintiff has standing, we simply ask whether the "operation or enforcement," *Georgia Latino All. for Hum. Rts. v. Governor of Ga.*, 691 F.3d 1250, 1257 (11th Cir. 2012) (cleaned up), of the government policy would cause a reasonable would-be speaker to "self-censor[]," *Wollschlaeger*, 848 F.3d at 1305—even where the policy "fall[s] short of a direct prohibition against the exercise of First Amendment rights," *Laird v. Tatum*, 408 U.S. 1, 11 (1972). In making that assessment, the threat of formal discipline or punishment is relevant to the inquiry, but it is not decisive. The fundamental question under our precedent—as well as under the precedent of other courts that have decided similar "speech code" cases—is whether the challenged policy "objectively chills" protected expression. *See, e.g.*, *Speech First, Inc. v. Fenves*, 979 F.3d 319, 330–35 (5th Cir. 2020) (holding, in campus-speech case, that fear of the investigative process is sufficient to create an "objective chill" that gives rise to standing); *Speech First, Inc. v. Schlissel*, 939 F.3d 756, 764 (6th Cir. 2019) (same); *Speech First, Inc. v. Killeen*, 968 F.3d 628, 639 n.1 (7th Cir. 2020) (acknowledging, in campus-speech case, that there is "some degree of overlap" between the "credible threat" and "objective chill" inquiries).

## B

As already noted, Speech First challenges two UCF policies. For reasons we will explain, because the application of those policies objectively chills its members' speech, Speech First has standing to challenge both.

**1**

We begin with whether Speech First has standing to challenge the discriminatory-harassment policy. The district court held that it did. We agree.

The discriminatory-harassment policy objectively chills speech because its operation would cause a reasonable student to fear expressing potentially unpopular beliefs. As already explained, UCF's discriminatory-harassment policy prohibits a broad swath of expressive activity—both "verbal" and "electronic"—touching on any of a number of characteristics, including "race," "national origin," "religion [or] non-religion," "genetic information," "sex," and "political affiliation[]." The policy says that the prohibited speech "may take many forms, including verbal acts, name-calling, graphic or written statements," or, even more broadly, "other conduct that may be humiliating." And it uses a "totality of known circumstances" approach, based on a long but non-exhaustive list of factors, to determine whether speech "unreasonably . . . alters," among other things, a student's "participation in a university program." Expanding its reach even further, the policy prohibits students not only from engaging in prohibited speech themselves, but also from "encouraging" or "condoning" other students' speech, or even "failing to intervene" to stop it. And further still, the student code of conduct states that the rules contained therein—including the discriminatory-harassment policy—"should be read broadly and are not designed to define prohibited conduct in exhaustive terms."

The discriminatory-harassment policy's imprecision exacer-bates its chilling effect. To take just one example, what does it mean for one student's speech to "unreasonably . . . alter[]" an-other student's educational experience? Both terms—"unreasona-bly" and "alter[]"—are pretty amorphous, their application would likely vary from one student to another, and the University's total-ity-of-known-circumstances approach to determining whether par-ticular speech crosses the line only makes matters worse. To be clear, these concerns aren't speculative. At oral argument, we asked the University's lawyer a series of questions about whether particular statements would violate the discriminatory-harassment policy: (1) "abortion is immoral"; (2) "unbridled open immigration is a danger to America on a variety of levels"; and (3) "the Palestin-ian movement is antisemitic."[3] To his considerable credit—but to

---

[3] In full:

1.  "Suppose I were to distribute pamphlets at a time that the university allows me to, or suppose I were to be permitted to speak at a time and a place the university allows me to speak, and I were to say that in my view, abortion is immoral, it's a sin against God, and it will yield eter-nal damnation. Suppose I were to hold that view. It's a religious view. It's a view that I'm expressing through speech at a time and a place that the University allows me to speak. Would that run me afoul of the harassment policy?" Oral Arg. at 29:10–29:57.

2.  "Suppose I were to use my opportunity to speak as a student on cam-pus and I were to say that the immigration laws of the United States are deeply flawed, that unbridled open immigration is a danger to America on a variety of levels. We ought to throw up a wall, etc., etc.,

the policy's considerable discredit—he candidly acknowledged that
while "it d[id] not sound to [him]" like the speech would be pro-
scribed under the policy, he couldn't say for sure because "the uni-
versity will consider all the facts and circumstances there" and be-
cause he couldn't "prejudge everything." Oral Arg. at 28:43–33:55.
If UCF's own attorney—as one intimately familiar with the Univer-
sity's speech policies—can't tell whether a particular statement
would violate the policy, it seems eminently fair to conclude that
the school's students can't either.

Although it arose in a different context, our decision in *Har-
rell v. Florida Bar*, 608 F.3d 1241 (11th Cir. 2010), supports Speech
First's position. In that case, we held that a lawyer's speech was
chilled—and that he therefore had standing to sue—where certain
Florida bar rules failed to provide a "person of ordinary intelligence
a reasonable opportunity to know what is prohibited and fail[ed] to
provide explicit standards for those who apply them." *Id.* at 1254
(quotation omitted). Like the lawyer in *Harrell*, the students here

---

etc. Would that speech be proscribed under the harassment policy?
Might not a student on campus who fell into the category of being a
'dreamer' take deep offense to that and say that that constituted har-
assment [within the meaning of the] policy? It was severe. It went to
his very right to be where he was, to learn on that campus." *Id.* at
31:36–32:33.

3.  "Suppose [a student] were to say, at a time that the University allows
her or him to speak, that the Palestinian movement is antisemitic, it's
riddled with antisemitism from beginning to end. Would that speech
amount to harassment?" *Id.* at 41:39–42:00.

are indisputably subject to the discriminatory-harassment policy. And like the regulations in *Harrell*, UCF's policy fails to provide students with specific enough information to determine whether any particular statement is permitted or prohibited.

Given the discriminatory-harassment policy's astonishing breadth—and slipperiness—we think it clear that a reasonable student could fear that his speech would get him crossways with the University, and that he'd be better off just keeping his mouth shut. That sort of "objective chill" suffices to give the affected students— and thus Speech First—standing.

**2**

The district court held that Speech First lacked standing to challenge the bias-related-incidents policy because, the court said, the JKRT couldn't punish students itself but, rather, could only refer them to other university actors for discipline. We hold that the district court erred in focusing so singularly on the JKRT's power to punish. The reason, already explained, is that a government actor can objectively chill speech—through its implementation of a policy—even without formally sanctioning it. Punishment is no doubt relevant to the objective-chill analysis, and may well be sufficient to prove the requisite chill, but analogous precedent makes clear that it is not decisive and, in any event, is not uniformly necessary.

The seminal case is *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58 (1963). There, the Supreme Court considered the

constitutionality of certain actions of the "Rhode Island Commis-
sion to Encourage Morality in Youth," whose charge it was to "ed-
ucate the public concerning any book, picture, pamphlet, ballad,
printed paper or other thing containing obscene, indecent or im-
pure language, or manifestly tending to the corruption of the
youth." *Id.* at 59.  The commission's usual practice was to notify a
bookseller "on official . . . stationery that certain designated books
or magazines distributed by him had been reviewed by the Com-
mission and had been declared by a majority of its members to be
objectionable for sale," to "thank[ him] in advance[] for his 'coop-
eration,'" to "remind[ him] of the Commission's duty to recom-
mend to the Attorney General prosecution of purveyors of obscen-
ity," and to inform him that "[c]opies of the lists of 'objectionable'
publications were circulated to local police departments."  *Id.* at
61–63.

   The state defended against the bookseller's contention that
the challenged practices chilled his First Amendment rights on the
ground that the commission had no formal disciplinary authority:
"[I]t does not regulate or suppress obscenity but simply exhorts
booksellers and advises them of their legal rights." *Id.* at 66.  The
Court rejected as "untenable" the state's argument, which was
"premised on the Commission's want of power to apply formal le-
gal sanctions." *Id.*  The Court likewise rejected the state's conten-
tion that the bookseller's "compliance with the Commission's di-
rectives" was in any meaningful sense "voluntary," despite the fact
that a bookseller was technically "'free' to ignore" that body's

notices: "People do not," the Court emphasized, "lightly disregard public officers' thinly veiled threats to institute criminal proceedings against them if they do not come around." *Id.* at 68.  Rather, the Court held that even "informal sanctions"—including "coercion, persuasion, and intimidation"—can sufficiently inhibit expression as to violate the First Amendment, and to give a plaintiff standing to sue.  *Id.* at 64 n.6, 67.  It is necessary, the Court held, to "look through forms to the substance and recognize that informal censorship may sufficiently inhibit"—*i.e.*, chill—"the circulation of publications to warrant injunctive relief."  *Id.* at 67.

The Second Circuit's decision in *Okwedy v. Molinari*, 333 F.3d 339 (2d Cir. 2003) (per curiam), is similar.  The plaintiffs in that case hired a billboard company to display signs in Staten Island denouncing homosexuality.  *Id.* at 340.  The Staten Island Borough president sent a letter to the billboard company stating that the signs were "unnecessarily confrontational and offensive" and "convey[ed] an atmosphere of intolerance . . . [un]welcome in our Borough," and he asked a representative of the company to contact the "Chair of [his] Anti-Bias Task Force . . . to discuss further the issues [he had] raised in th[e] letter."  *Id.* at 341–42.  Capitulating, the billboard company removed the signs.  *Id.* at 342.

When the plaintiffs sued, the district court dismissed their action, "rel[ying] heavily on . . . the fact" that the borough president "did not have direct regulatory or decisionmaking authority" over the billboard company.  *Id.* at 343.  The Second Circuit reversed, holding that "[a]lthough the existence of regulatory or

other direct decisionmaking authority is certainly relevant to the question of whether a government official's comments were unconstitutionally threatening or coercive, a defendant without such direct regulatory or decisionmaking authority can also exert an impermissible type or degree of pressure." *Id.* The billboard company, the court of appeals emphasized, "could reasonably have believed," based on the information available to it, that the borough president "intended to use his official power to retaliate against it if it did not respond positively to his entreaties." *Id.* at 344.

*Bantam Books* and *Okwedy* demonstrate a commonsense proposition: Neither formal punishment nor the formal power to impose it is strictly necessary to exert an impermissible chill on First Amendment rights—indirect pressure may suffice. To be sure, the University wasn't quite as heavy-handed here as were the government actors in *Bantam Books* and *Okwedy*. But just as surely, the students targeted here are—for the most part—teenagers and young adults who, it stands to reason, are more likely to be cowed by subtle coercion than the relatively sophisticated business owners in those cases. *Cf. Fare v. Michael C.*, 442 U.S. 707, 725 (1979) (considering a defendant's age in determining whether a *Miranda* waiver is voluntary); *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973) (considering a defendant's "youth" as a factor in determining whether his consent to a search was voluntary); *United States v. Owen*, 963 F.3d 1040, 1049 (11th Cir. 2020) (considering a defendant's age in determining whether the "waiver of his right to

counsel was knowing and voluntary").[4]  And the question for us is
whether the average college-aged student would be intimidated—
and thereby chilled from exercising her free-speech rights—by sub-
jection to the bias-related-incidents policy and the JKRT's role in
enforcing it.

The answer to that question, we think, is yes.  No reasonable
college student wants to run the risk of being accused of "offen-
sive," "hostile," "negative," or "harmful" conduct—let alone "hate
or bias."  Nor would the average college student want to run the
risk that the University will "track[]" her, "monitor[]" her, or
mount a "comprehensive response[]" against her.  And as with the
discriminatory-harassment policy, the breadth and vagueness of
the bias-related-incidents policy exacerbates the chill that the aver-
age student would feel.  The policy, for instance, reaches "any be-
havior or action"—even if both "legal" and "unintentional"—that
is "directed towards an individual or group" based on "actual or
perceived identity characteristics"—including but not limited to

---

[4] There is, we observe, a certain irony in the facts (1) that UCF created the
JKRT to address situations in which students felt intimidated or marginalized
and (2) that now, Speech First's members claim to have been intimidated and
marginalized by the JKRT—"kind of like . . . snowflakes all around." Oral Arg.
at 10:10–10:51.  We asked Speech First's lawyer at oral argument why *every-
one* shouldn't just "put on their big boy and big girl pants" and deal with some
adversity.  *Id.* His answer, we think, captures a valid distinction:  "The state is
a really big boy." *Id.* at 10:52–11:20.  The University—*i.e.*, the state—can far
more easily intimidate, and thereby objectively chill, college students than can
those students' peers.  And objective chill is the standard.

those rooted in any of at least 11 different traits.  So too, the policy defines a "bias act" as anything that "may contribute to creating an unsafe, negative, unwelcoming environment [for] the victim, or anyone who shares the same social identity as the victim, and/or community members of the university."  And the policy applies to a non-exhaustive laundry list of behaviors—including, among others, "graffiti [and] signs," "confrontation," and "gestures."  Pair that broad, vague, and accusatory language with the task-force-ish name of the investigating organization—the Just Knights *Response Team*—and we think it clear that the average college student would be intimidated, and quite possibly silenced, by the policy. Because the bias-related-incidents policy objectively chills student speech, Speech First's members have standing to challenge it.[5]

## III

On, then, to the merits.  We consider four factors when determining the propriety of preliminary injunctive relief: (1) substantial likelihood of success on the merits, (2) irreparable harm, (3) the balance of equities, and (4) the public interest.  *Gonzalez v. Governor of Georgia*, 978 F.3d 1266, 1271 (11th Cir. 2020).

---

[5] To be clear, the fact that the JKRT's website once refers to the accused student's participation as "voluntary" doesn't change the overall tenor of the message conveyed there—namely, that if your speech crosses our line, we will come after you.  The freedom that a student has to ignore the JKRT process is akin, we think, to the freedom that a child has to refuse his parent when she asks, "Would you please clean up your room?"  *Cf. Bantam Books*, 372 U.S. at 68.

Likelihood of success on the merits "is generally the most important of the four factors." *Id.* at 1271 n.12 (quotation omitted).

## A

We begin with the discriminatory-harassment policy. We conclude that Speech First is substantially likely to establish that the policy is both (1) impermissibly overbroad and (2) a content- and viewpoint-based restriction of speech.

## 1

The discriminatory-harassment policy is almost certainly unconstitutionally overbroad. The overbreadth doctrine is designed "to prevent the chilling of protected expression." *Massachusetts v. Oakes*, 491 U.S. 576, 584 (1989). A regulation that covers substantially more speech than the First Amendment allows is overbroad and thus invalid. *See FF Cosms. FL, Inc. v. City of Miami Beach*, 866 F.3d 1290, 1303 (11th Cir. 2017). We've already plowed much of this ground in assessing Speech First's standing to sue, but briefly, the policy (1) prohibits a wide range of "verbal, physical, electronic, and other" expression concerning any of (depending on how you count) some 25 or so characteristics; (2) states that prohibited speech "may take many forms, including verbal acts, name-calling, graphic or written statements" and even "other conduct that *may* be humiliating"; (3) employs a gestaltish "totality of known circumstances" approach to determine whether particular speech, for instance, "unreasonably . . . alters" another student's educational experience; and (4) reaches not only a student's own

speech, but also her conduct "encouraging," "condoning," or "failing to intervene" to stop another student's speech.

The policy, in short, is staggeringly broad, and any number of statements—some of which are undoubtedly protected by the First Amendment—could qualify for prohibition under its sweeping standards.  To take a few obvious examples, the policy targets "verbal, physical, electronic or other conduct" based on "race," "ethnicity," "religion [or] non-religion," "sex," and "political affiliation."  Among the views that Speech First's members have said they want to advocate are that "abortion is immoral," that the government "should not be able to force religious organizations to recognize marriages with which they disagree," that "affirmative action is deeply unfair," that "a man cannot become a woman because he 'feels' like one," that "illegal immigration is dangerous," and that "the Palestinian movement is anti-Semitic."  Doc. 30 at 22, 27.  Whatever the merits or demerits of those sorts of statements, they seem to us to constitute "core political speech," with respect to which "First Amendment protection is 'at its zenith.'"  *Buckley v. Am. Const. L. Found., Inc.*, 525 U.S. 182, 183 (1999) (citation omitted)); *accord, e.g.*, *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 347 (1995).  Because the discriminatory-harassment policy restricts political advocacy and covers substantially more speech than the First Amendment permits, it is fatally overbroad.

### 2

The University's policy isn't just overbroad, it's also an impermissible content- and viewpoint-based speech restriction—or, at the very least, likely so.

"Content-based laws—those that target speech based on its communicative content—are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2014); *R.A.V. v. City of St. Paul*, 505 U.S. 377, 382 (1992) ("Content-based regulations are presumptively invalid." (citations omitted)). A governmental regulation of speech is content-based if it applies by its terms to speech "because of the topic discussed" or if, even though facially neutral, it "cannot be justified without reference to the content" of the speech. *Reed*, 576 U.S. at 163–64 (quotation marks omitted). In other words, a regulation is content-based if "'enforcement authorities' [must] 'examine the content of the message that is conveyed to determine whether' a violation has occurred." *McCullen v. Coakley*, 573 U.S. 464, 479 (2014) (citation omitted).

Viewpoint discrimination is even more anathematic to the First Amendment: "When the government targets not subject matter, but particular views taken by speakers on a subject, the violation of the First Amendment is all the more blatant. Viewpoint discrimination is thus an egregious form of content discrimination." *Rosenberger v. Rectors and Visitors of the Univ. of Virginia*, 515 U.S. 819, 829 (1995) (citation omitted). The Supreme Court

has reiterated time and again—and increasingly of late—the "bed-rock First Amendment principle" that "[s]peech may not be banned on the ground that it expresses ideas that offend." *Matal v. Tam*, 137 S. Ct. 1744, 1751 (2017). "[R]estrictions based on content must satisfy strict scrutiny, and those based on viewpoint are prohibited," seemingly as a *per se* matter. *Minn. Voters All. v. Mansky*, 138 S. Ct. 1876, 1885 (2018); *see also, e.g.*, *Iancu v. Brunetti*, 139 S. Ct. 2294, 2299 (2019) ("The government may not discriminate against speech based on the ideas or opinions it conveys.").

UCF's discriminatory-harassment policy seems to us both a content- and a viewpoint-based speech restriction. It is content-based because the University must "examine the content of the message that is conveyed to determine whether" it harasses another student "based upon" any of a long list of characteristics—*e.g.*, race, sex, political affiliation, etc. *McCullen*, 573 U.S. at 479. Because the policy is a content-based restriction, it must satisfy strict scrutiny, and we doubt it can. Although the University may have a compelling interest in preventing students from disrupting its educational environment, its policy doesn't seem to us to be narrowly tailored to that end. As already explained, the policy covers speech that pertains to any of a number of characteristics, can take any of a variety of forms (including "verbal acts" and "written statements," and "other conduct that *may* be humiliating"), and that is deemed, by reference to a non-exhaustive seven-factor test, to "unreasonably . . . alter" another student's educational experience—and, indeed, to the acts of "condoning or encouraging," or even

"failing to intervene" to stop another from speaking.  That, with respect, is the opposite of narrow tailoring.

In any event, the discriminatory-harassment policy likely goes beyond content-discrimination to discriminate on the basis of viewpoint.  Even within the category of harassing speech, UCF prohibits *only* speech that is "discriminatory."  To borrow the Supreme Court's recent observation about similarly loaded terms in one of the Lanham Act's trademark registration provisions, which it found impermissibly viewpoint-based, "[t]he meaning[] of" the word "discriminatory" is "not mysterious"—it connotes speech that denigrates rather than validates certain characteristics.  *Iancu*, 139 S. Ct. at 2299.  Here, as there, "resort to [the] dictionaries," *id.*, confirms that commonsense conclusion.  *See, e.g., Discriminatory*, Oxford English Dictionary (online ed.) ("That treats a person or group in an unjust or prejudicial manner.").  In prohibiting only one perspective, UCF targets "particular views taken by" students, *Rosenberger*, 515 U.S. at 829, and thereby chooses winners and losers in the marketplace of ideas—which it may not do.  *See, e.g., Mansky*, 138 S. Ct. at 1885; *Tam*, 137 S. Ct. at 1767 (Kennedy, J., concurring in part and concurring in the judgment) ("The danger of viewpoint discrimination is that the government is attempting to remove certain ideas or perspectives from a broader debate. That danger is all the greater if the ideas or perspectives are ones a

particular audience might think offensive, at least at first hear-
ing.").[6]

_____

[6] There is one loose end.  The University seeks the benefit of the more defer-
ential First Amendment standard articulated in *Tinker v. Des Moines Inde-
pendent Community School District*, 393 U.S. 503 (1969), and its progeny.  In
particular, the University asserts that its discriminatory-harassment policy
complies with *Tinker* because it prevents campus disruption.  The district
court likewise relied heavily on *Tinker*'s indulgent framework.

There are three problems.  First, it's not at all clear that *Tinker*'s more
lenient standard applies in the university—as opposed to the elementary- and
secondary-school—setting.  The caselaw sends mixed signals.  On the one
hand, this Court applied *Tinker* to speech regulations in a college setting
where a student claimed that the college's anti-stalking policy was "unconsti-
tutionally overbroad and vague." *Doe v. Valencia Coll.*, 903 F.3d 1220, 1229
(11th Cir. 2018).  And the Supreme Court once cited *Tinker* for the proposition
that state universities have an "undoubted prerogative to enforce reasonable
rules governing student conduct"—even while reaffirming that "state colleges
and universities are not enclaves immune from the sweep of the First Amend-
ment." *Papish v. Bd. of Curators of Univ. of Missouri*, 410 U.S. 667, 669–70
(1973).  On the other hand, the Supreme Court has emphasized that its "prec-
edents . . . leave no room for the view that, because of the acknowledged need
for order [in state educational institutions,] First Amendment protections
should apply with less force on college campuses than in the community at
large," *Healy v. James*, 408 U.S. 169, 180 (1972), and further, that academic
freedom in a university setting is "a special concern of the First Amendment,
which does not tolerate laws that cast a pall of orthodoxy over the classroom,"
and that universities are "peculiarly the marketplace of ideas." *Keyishian*, 385
U.S. at 603 (cleaned up).  In the same way, we have emphasized "that the dan-
gers of viewpoint discrimination are *heightened* in the university setting."
*Gay Lesbian Bisexual All. v. Pryor*, 110 F.3d 1543, 1550 (11th Cir. 1997) (citing
*Rosenberger*, 515 U.S. 819 (1995)).

### 3

Having concluded that Speech First is likely to succeed on the merits—the most important preliminary-injunction criterion—we turn briefly to the remaining criteria.  First, in the absence of a preliminary injunction, Speech First would undoubtedly suffer irreparable harm—which we have called "the sine qua non of injunctive relief," *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000)

---

Second, and separately, the Supreme Court recently limited *Tinker*'s application, even in the high-school setting.  It held that "courts must be more skeptical of a school's efforts to regulate off-campus speech" and that "[w]hen it comes to political or religious speech that occurs outside school or a school program or activity, the school will have a heavy burden to justify intervention."  *Mahanoy Area Sch. Dist. v. B. L. ex rel. Levy*, 141 S. Ct. 2038, 2046 (2021).  Accordingly, even if the *Tinker* framework applied here as a general matter, UCF's policy, which reaches beyond the classroom, may well fall (at least in part) outside of it.

Finally, by its own terms, *Tinker*'s deferential standard doesn't apply to viewpoint-based restrictions like the one we confront here.  The Court said there that "[i]n order for the State in the person of school officials to justify prohibition of a particular expression of opinion, it must be able to show that its action was caused by something more than a mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint."  393 U.S. at 509.  The Supreme Court has consistently held that the government may not regulate on the basis of viewpoint even within a category of otherwise proscribable speech.  *See, e.g., R.A.V.*, 505 U.S. at 383–390 (explaining that even if some categories of speech are unprotected by the First Amendment, the government may not regulate within an excluded category based on the viewpoint expressed).  So even if UCF could (per *Tinker*) restrict harassing speech that disrupts the school's functions, it couldn't do so, as it has here, based on the viewpoint of that speech.  Put simply, the University can't pick and choose which types of disruptive speech to prohibit.

36                    Opinion of the Court                    21-12583

(citations and internal quotations omitted).  We have expressly
held that "an ongoing violation of the First Amendment constitutes
an irreparable injury."  *FF Cosms.*, 866 F.3d at 1298.  Second, on
the balance of equities, we can see arguments going both ways:  On
the one hand, Speech First's members' free-speech rights will be
impaired if they are silenced; on the other hand, the University (and
other students) may have to tolerate some unprotected conduct.
Finally, we think that the public-interest factor favors granting the
injunction.  As the Supreme Court has stated, "[t]he First Amend-
ment, in particular, serves significant societal interests."  *First Nat'l
Bank of Bos. v. Bellotti*, 435 U.S. 765, 776 (1978); *see also Demo-
cratic Exec. Comm. Of Fla. v. Lee*, 915 F.3d 1312, 1327 (11th Cir.
2019) ("[T]he public interest is served when constitutional rights
are protected.").  Although the First Amendment sometimes al-
lows hurtful expression, that's a cost that "We the People" have
accepted as necessary to protect free-speech interests more gener-
ally.  *See Otto*, 981 F.3d at 864 ("The First Amendment exists pre-
cisely so that speakers with unpopular ideas do not have to lobby
the government for permission before they speak.").

                              *   *   *

        After considering each of the four factors—and in deference
to the first and second as the most significant—we hold that Speech
First is entitled to an injunction of the discriminatory-harassment
policy.

## B

Because it found (erroneously, we conclude) that Speech First lacked standing to challenge the bias-related-incidents policy, the district court never considered that policy on the merits. Accordingly, we remand to the district court to decide in the first instance whether the chill caused by the bias-related-incidents policy is substantial enough to violate the First Amendment. *See Callahan v. U.S. Dep't of Health & Human Servs.*, 939 F.3d 1251, 1266 (11th Cir. 2019) ("We are, after all, a court of review, not a court of first view."). Relatedly, we leave it to the district court to determine in the first instance whether and to what extent the objective chill that gives Speech First Article III standing, *see supra* at 23–28, likewise establishes its claim on the merits.

## IV

Nowhere is free speech more important than in our leading institutions of higher learning. Colleges and universities serve as the founts of—and the testing grounds for—new ideas. Their chief mission is to equip students to examine arguments critically and, perhaps even more importantly, to prepare young citizens to participate in the civic and political life of our democratic republic. It's hardly surprising, then, that the Supreme Court has "long recognized that, given the important purpose of public education and the expansive freedoms of speech and thought associated with the university environment, universities occupy a special niche in our constitutional tradition." *Grutter v. Bollinger*, 539 U.S. 306, 329 (2003); *see also Healy*, 408 U.S. at 180 ("'The college classroom with

its surrounding environs is peculiarly the 'marketplace of ideas.'");
*Sweezy v. State of N.H. by Wyman*, 354 U.S. 234, 262 (1957)
(Frankfurter, J., concurring) (emphasizing that a "free society" de-
pends "on free universities"). Accordingly, it is imperative that
colleges and universities toe the constitutional line when monitor-
ing, supervising, and regulating student expression. Despite what
we presume to be the very best of intentions, it seems to us sub-
stantially likely that the University of Central Florida crossed that
line here.

★   ★   ★

For the foregoing reasons, we hold (1) that Speech First has
standing to challenge both the discriminatory-harassment and bias-
related-incidents policies, (2) that the district court abused its dis-
cretion in refusing to preliminarily enjoin the discriminatory-har-
assment policy, and (3) that the district court should determine in
the first instance whether Speech First is entitled to a preliminary
injunction of the bias-related-incidents policy.

**REVERSED** in part, **VACATED** in part, and **REMANDED**.

21-12583                 MARCUS, J., concurring                         1

MARCUS, Circuit Judge, concurring:

I join fully in Judge Newsom's opinion for this Court.  The
University of Central Florida's discriminatory-harassment policy
almost surely violates the First Amendment.  It is grievously over-
broad, and it is a content- and viewpoint-based restraint on free
speech.

I write separately to underscore the grave peril posed by a
policy that effectively polices adherence to intellectual dogma.
History provides us with ample warning of those times and places
when colleges and universities have stopped pursuing truth and
have instead turned themselves into cathedrals for the worship of
certain dogma.  By depriving itself of academic institutions that
pursue truth over any other concern, a society risks falling into the
abyss of ignorance.  Humans are not smart enough to have ideas
that lie beyond challenge and debate.  A discriminatory-harassment
policy that assumes the most popular idea or the idea that least "in-
terferes with, limits, deprives, or alters the terms or conditions of
education" is the correct one is plainly at odds with the First
Amendment and our notion of free speech.

It is in a university setting, perhaps above all others, that our
foundational ideas must be subject to examination and re-examina-
tion.  The process is not necessarily gentle or even cordial, but it
cannot be cut off because sometimes it is unpleasant or provocative
or exasperating.  "Education should not be intended to make peo-
ple comfortable, it is meant to make them think.  Universities

should be expected to provide the conditions within which hard thought, and therefore strong disagreement, independent judgment, and the questioning of stubborn assumptions, can flourish in an environment of the greatest freedom." Report of the Committee on Freedom of Expression, UNIV. OF CHICAGO (2015) (quoting President Hanna Holborn Gray).

The University's discriminatory-harassment policy touches on every conceivable topic that may come up on a college campus. Religion, political affiliation, ethnicity, national origin, age, gender identity or expression, and genetic information are just a select few targeted by the policy. The specter of punishment for expressing unorthodox views on these topics stifles rigorous intellectual debate. And the harm is not limited to professors and students while they are on campus. Our future civic and scientific leaders surely will take these values with them after graduation. See Maj. Op. at 37-38.

A university that has placed its highest premium on the protection of feelings or safe intellectual space has abandoned its core mission. The protection of feelings or the creation of safe space rightly might be the foremost goal in some settings, like at a family dinner, but it is not right for a university. Its unambiguous mission must remain the pursuit of truth. John Stuart Mill put it best in his classic work, On Liberty:

> The peculiar evil of silencing the expression of an
> opinion is that it is robbing the human race; posterity
> as well as the existing generation; those who dissent

> from the opinion, still more than those who hold it.
> If the opinion is right, they are deprived of the oppor-
> tunity of exchanging error for truth; if wrong, they
> lose, what is almost as great a benefit, the clearer per-
> ception and livelier impression of truth produced by
> its collision with error.

JOHN STUART MILL, ON LIBERTY 19 (1859).

A university that turns itself into an asylum from controversy has
ceased to be a university; it has just become an asylum.

21-12583            STORY, J., concurring                 1

STORY, District Judge, concurring:

I concur in the opinion of the Court but write separately to make clear that the opinion does not prohibit a university from establishing a program that provides students an opportunity to engage in civil discussions concerning differing viewpoints.[1] "Colleges and universities unquestionably benefit from the flow of ideas, debate, and deliberation on campus. These institutions should strive to foster an environment where critical thoughts, and sometimes strong disagreement, can flourish." *Speech First, Inc. v. Killeen*, 968 F.3d 628, 632 (7th Cir. 2020) (citation and quotations omitted). The only restriction placed on such programs by today's decision is an important one. The program may not be designed in such a way as to chill First Amendment rights. Insisting on compliance with the First Amendment should not prevent universities from exploring ways to lower the temperature on debate and help their students learn how to listen to and understand opposing viewpoints. As acknowledged by Speech First, the creation of such programs without running afoul of the First Amendment is possible. Oral Arg. at 54:08-55:49; Appellant Reply Br. at 16-17.

---

[1] I do not mean to delve too deeply into the merits of the claim based on the bias-related-incidents policy. I recognize that as a court of review, it is not for us to decide this issue in the first instance. However, as it has been suggested the district court may determine that "the objective chill that gives Speech First Article III standing, likewise establishes its claim on the merits," I offer these observations.

## UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

ELBERT PARR TUTTLE COURT OF APPEALS BUILDING
56 Forsyth Street, N.W.
Atlanta, Georgia 30303

David J. Smith                                                          For rules and forms visit
Clerk of Court                                                          www.ca11.uscourts.gov

April 21, 2022

MEMORANDUM TO COUNSEL OR PARTIES

Appeal Number:  21-12583-DD
Case Style:  Speech First, Inc. v. Alexander Cartwright
District Court Docket No:  6:21-cv-00313-GAP-GJK

Electronic Filing
All counsel must file documents electronically using the Electronic Case Files ("ECF") system,
unless exempted for good cause. Although not required, non-incarcerated pro se parties are
permitted to use the ECF system by registering for an account at www.pacer.gov. Information
and training materials related to electronic filing are available on the Court's website. Enclosed
is a copy of the court's decision filed today in this appeal. Judgment has this day been entered
pursuant to FRAP 36. The court's mandate will issue at a later date in accordance with FRAP
41(b).

The time for filing a petition for rehearing is governed by 11th Cir. R. 40-3, and the time for
filing a petition for rehearing en banc is governed by 11th Cir. R. 35-2. Except as otherwise
provided by FRAP 25(a) for inmate filings, a petition for rehearing or for rehearing en banc is
timely only if received in the clerk's office within the time specified in the rules. Costs are
governed by FRAP 39 and 11th Cir.R. 39-1. The timing, format, and content of a motion for
attorney's fees and an objection thereto is governed by 11th Cir. R. 39-2 and 39-3.

Please note that a petition for rehearing en banc must include in the Certificate of Interested
Persons a complete list of all persons and entities listed on all certificates previously filed by
any party in the appeal. See 11th Cir. R. 26.1-1. In addition, a copy of the opinion sought to be
reheard must be included in any petition for rehearing or petition for rehearing en banc. See
11th Cir. R. 35-5(k) and 40-1 .

Counsel appointed under the Criminal Justice Act (CJA) must submit a voucher claiming
compensation for time spent on the appeal no later than 60 days after either issuance of mandate
or filing with the U.S. Supreme Court of a petition for writ of certiorari (whichever is later) via
the eVoucher system. Please contact the CJA Team at (404) 335-6167 or
cja_evoucher@ca11.uscourts.gov for questions regarding CJA vouchers or the eVoucher
system.

Pursuant to Fed.R.App.P. 39, costs taxed againt the appellee.

Please use the most recent version of the Bill of Costs form available on the court's website at www.ca11.uscourts.gov.

For questions concerning the issuance of the decision of this court, please call the number referenced in the signature block below. For all other questions, please call Bradly Wallace Holland, DD at 404-335-6181.

Sincerely,

DAVID J. SMITH, Clerk of Court

Reply to: Djuanna H. Clark
Phone #: 404-335-6151

OPIN-1A Issuance of Opinion With Costs